[No. B192341. Second Dist., Div. Eight. Oct. 12, 2007.]

JONES & MATSON et al., Plaintiffs and Appellants, v.
ISADORE HALL et al., Defendants and Appellants.

## COUNSEL

James A. Owen for Plaintiffs and Appellants.

Declues, Burkett & Thompson, J. Michael Declues and Steven J. Lowery for Defendants and Appellants.

## OPINION

**FLIER, J.**—Pursuant to title 42 United States Code section 1983, plaintiffs Urrea C. Jones, Jr., Stephen K. Matson and their law firm, Jones & Matson, sued their former client, the Compton Unified School District (District), the former and current members of its board of trustees, its superintendent and its former associate superintendent for violation of plaintiffs' First Amendment rights under color of state law and for conspiracy to violate plaintiffs' rights.[1] Plaintiffs alleged that defendants first reduced the use of plaintiffs' legal services, and then withdrew the District's cases after plaintiffs filed a government claim for damages, in retaliation for plaintiffs' refusal to support the political campaigns of defendants Hall and Calhoun.

The trial court dismissed the District after sustaining its demurrer and granted a nonsuit to defendants Quijada-Barrera, Shipp, Sharif and Patillo. At the conclusion of trial, a jury returned a special verdict for defendants Hall, Calhoun, Beeman and Gonzales, finding those defendants had not intentionally sought to deprive plaintiffs of their constitutional rights. The court subsequently denied plaintiffs' motions for new trial and for judgment notwithstanding the verdict and granted attorney fees under title 42 United States Code section 1988 to the four defendants who prevailed by nonsuit.

Plaintiffs appeal from the trial court's grant of nonsuit, denial of their motion for judgment notwithstanding the verdict and award of attorney fees. Defendants Hall, Calhoun, Beeman and Gonzales cross-appeal from the trial court's denial of their motion for nonsuit.

We affirm the judgment, denial of the motion for judgment notwithstanding the verdict and award of attorney fees. We dismiss the cross-appeal as moot.

---

[1] The former and current board members are defendants Isadore Hall, Barbara Jean Calhoun, Erica Quijada-Barrera, Marjorie A. Shipp, Emma Sharif and Cloria L. Patillo; the District's superintendent is defendant Jesse L. Gonzales and its former associate superintendent is defendant R. Keith Beeman.

## FACTS

1. *District's Emergence from State Control*

Through December 2001, the District operated under the direct control of a state administrator acting on behalf of the State Superintendent of Public Instruction. Jones & Matson performed legal services for the District under a May 2001 contract with the state administrator.

The District emerged from state control after December 2001, when the state administrator became a trustee who retained only a veto power over the District's fiscal matters.

2. *District's Contract with Jones & Matson*

In June 2002, the board of trustees voted to renew Jones & Matson's legal services contract. At the same time, the board renewed the legal contracts for its two other law firms, Littler Mendelson, which served as general counsel to the District, and Orbach & Huff, which handled its real estate matters. These contracts had not yet expired, but the board wished to enter into contracts with District vendors directly after emerging from the state administrator's control.

Jones & Matson's contract was renewed on a board vote of five to two, with defendants Calhoun and Quijada-Barrera voting against renewal. The renewed legal services contract increased Jones & Matson's hourly billing rates. The contract also provided that plaintiffs were to serve at the pleasure of the board and the contract could be terminated by either party upon 30 days' notice.

3. *District Concerns over Legal Costs*

Superintendent Gonzales was charged with responsibility for improving the District's performance both academically and fiscally to avoid the conditions that had previously required state administrative control.

Gonzales, as well as associate superintendent Beeman and several board members, had a continuing concern about the large amount of legal expenses being charged by Jones & Matson, which repeatedly exceeded the amount budgeted. Reducing legal expenses was a priority for Gonzales. In October 2001, Gonzales issued a directive requesting his staff not to contact outside legal counsel without prior authorization. Gonzales began to scrutinize and sign off on case assignments to ensure that matters which could be handled in-house were not being sent to outside counsel.

### 4. Directive to Reduce Legal Expenses

In June 2002, Gonzales issued a directive to the District's executive cabinet members stating that only he or Beeman was authorized to make contact with the District's legal counsel, i.e., Jones & Matson, Littler Mendelson, and Orbach & Huff. The directive advised staff to obtain prior approval from Gonzales before making any contact with the law firms.

Notwithstanding Gonzales's directive, District staff continued informally to consult Jones & Matson daily regarding personnel, discipline, grievance, claims and special education issues and lawsuits. No other law firm was representing the District in those areas at the time.

On September 20, 2002, Gonzales sent a letter to Beeman and his staff to express concern about "the escalating costs of legal services being provided the District by Jones & Matson." Gonzales directed that requests to make contact with the firm be submitted to him in writing for prior approval. Gonzales did not send a similar letter regarding either Littler Mendelson or Orbach & Huff because it was he who generally made the telephone calls to Littler Mendelson and the nature of Orbach & Huff's representation required little telephone contact.

### 5. Alleged Improper Political Campaign Solicitation

Hall served as president of the board of trustees from December 2001 to approximately June 2003. In 2002, Hall and Calhoun were running for the Compton City Council in a coordinated campaign. Hall and Jones arranged to meet for lunch on the 1st or 2d of July, 2002.

Hall testified that, during the lunch, Jones brought up the subject of Hall's running for city council, stating that "[t]hose things are kind of costly." Jones told Hall about a prior incident when a superintendent of another institution had asked Jones for help in a campaign. Jones said he "never gets involved in assisting [or] contributing to campaigns" and had been offended by the request.[2]

---

[2] Jones testified that Hall initiated the lunch and, when they met, Hall mentioned a mutual friend thought highly of Jones & Matson and had recommended that the District keep the firm as an attorney for the District. According to Jones, it was Hall who mentioned his campaign for city council, and Hall told Jones that, whenever he met a good person, he wanted to take that person along with him if he got elected. Jones testified he became uncomfortable and interrupted Hall, saying he did not make contributions to political campaigns and believed it was improper to do so.

On July 5, 2002, associate superintendent Beeman signed an authorization to refer 16 new files to Jones & Matson. Beeman testified that those cases had accumulated from the prior fiscal year that ended June 30, 2002. There had been no money left in the budget to pay for additional legal services, and Beeman had decided to hold those cases until the next fiscal year. Beeman testified Jones asked for Hall's signature as board president on the work authorization in Gonzales's absence from the office.[3]

Jones received the authorization for the new cases on July 19, 2002. On the same day, he also received a fax from Hall's campaign inviting him to an August 2002 fundraiser.[4]

Jones did not appear at Hall's fundraiser or make a contribution to his campaign. The day following the fundraiser, Hall's brother, Errick Lee, called Jones and suggested they get together. Lee was on the board of trustees for the Lynwood Unified School District, one of Jones & Matson's clients.

Jones and Lee had dinner in mid-September 2002. At dinner, Jones complained about Hall's having solicited a contribution from Jones and related the sequence of events. Jones told Lee his brother was "going to end up going to jail." Lee told Jones he did not believe the firm's not making a contribution would be a problem for the candidate, meaning Hall. Jones was not reassured, as he expected an apology from Lee and assurances Lee would tell his brother "not to do it." Jones speculated that Lee came to the dinner to "get the money that I had not given."

### 6. *Claimed Retaliation*

According to Jones, Beeman called him a few days later, on September 20. Jones testified Beeman stated that Hall and Calhoun wanted to terminate Jones & Matson's contract and Beeman was meeting with Gonzales to figure out how to do so. Beeman asked whether Jones & Matson was willing to complete its work on pending cases.

---

[3] Jones, on the other hand, contended he had never before seen a board president's signature on a written authorization to transfer cases despite seeing "hundreds" of such authorizations. It was Jones's belief that by signing the authorization Hall was sending a message that it was he who had obtained the contract renewal and the new cases for Jones & Matson.

[4] Hall testified it was his secretary who sent the invitation to Jones. Hall had a mailing list of about 1,500 people, and he did not think to remove Jones's name from the list after their luncheon conversation. Jones never called Hall or his campaign staff to complain about receiving the fundraiser invitation.

Jones responded by sending Beeman a letter dated September 22, 2002. Jones's letter stated: "You informed me last Friday, September 20, 2002, that it appears that Members of the Board of Trustees of the [District] have approached the superintendent and insisted that the District's agreement for legal services with the law firm of Jones & Matson be terminated. You also informed me that a meeting was scheduled for last Friday, September 20, 2002, to map out the conditions under which the contract would be terminated. However, the meeting has not yet occurred." Jones further asserted, "I made you aware some time ago that I had informed a [b]oard member that I would not make contributions to political campaigns and that last Monday, September 16, 2002, I also informed his campaign manager that I would not make contributions to political campaigns."

In the letter, Jones stated that he represented the District "and not you [Beeman] or any individual [b]oard [m]ember or employee." Jones's September 2002 letter further informed Beeman, "I am required by Rule 3-600 of the Rules of Professional Conduct to inform you that statements made to me are not confidential information and may be used in the interest of the District in a manner which may be adverse to you."

At trial, Beeman denied that he told Jones the Jones & Matson contract was being terminated or that he was meeting with the District superintendent to effect the termination.[5] Both Hall and Calhoun denied they sought to have Jones & Matson's contract terminated.

### 7. *Plaintiffs' Perceived Loss of Business and Claims for Damages*

Beeman subsequently explained to Jones that Jones had misunderstood their prior telephone conversation and that Beeman had only sought to inform Jones of the need for prior authorization for, rather than the termination of, future legal services.

The District provided about one-half of plaintiffs' business in 2001–2002. Jones claimed business from the District stopped "abruptly" after he sent the September 2002 letter.[6] Jones believed the reduction in business was related

---

[5] A memorandum from Beeman to Gonzales forwarding Jones's September 22, 2002, letter reported that Beeman had called Jones out of "professional courtesy" to inform him of the District's new procedure requiring Beeman to obtain Gonzales's authorization before requesting Jones & Matson to provide further services to the District. Beeman's memorandum states: "I do disagree with Mr. Jones, regarding one point. I did not tell Mr. Jones that [b]oard members approached you and insisted that his firm's contract be terminated or that his contract would be terminated. I did tell him, however, that I would need approval before I could consult with his firm on District matters."

[6] Jones & Matson billed the District over $1 million in legal fees for the 2001–2002 school year and about $800,000 for 2002–2003. In the 2002–2003 school year, the District staff began

to his refusal to contribute to Hall's campaign. He concluded Hall's campaign flier and the authorization for 16 new files signed by Hall were connected from the fact that he received both on the same day. He assumed from Hall's signature on the authorization that there was an intent to "extort" money. Because they were running a coordinated campaign, Jones believed Hall and Calhoun were acting in concert to terminate Jones & Matson's contract.[7]

Jones did not inform Gonzales of the perceived attempt to obtain political contributions from Jones's firm.

In May 2003, by letter to the board, plaintiffs made a claim for damages against defendants under the California Government Claims Act (Gov. Code, § 911.4). In the letter, Jones recounted the history of his firm's dealings with the District and his alleged communications with Hall, Lee and Beeman. He claimed that steps had been taken "to reduce and ultimately terminate the services of the firm" for the District and informed the board he had retained counsel with respect to the matter.[8] Jones stated his letter was both a "claim against the [defendants]" and a "petition for redress of grievances."

The District sent plaintiffs' claim to outside counsel for review.[9] The District's outside counsel recommended that the District withdraw all currently assigned cases from plaintiffs. Acting on the advice of counsel, Gonzales requested Jones & Matson to return all pending files to the District. The firm returned six files to the District on which work had not been completed and did no work for the District after May 2003.

Plaintiffs submitted a second claim to the District for damages under the Government Claims Act in June 2003. Plaintiffs alleged their services were terminated in retaliation for filing their May 2003 claim.

---

to do more work in-house because of budgetary concerns. The District's legal expenses substantially decreased after Jones & Matson ceased its work for the District as related, *post.*

[7] Jones admitted the board approved his handling two appeals on September 9, 2002, after he failed to appear at Hall's fundraiser. Matson conceded that the firm was retained to defend the District in two other matters after September 2002. Nevertheless, after plaintiffs failed to make contributions to Hall and Calhoun's political campaigns, plaintiffs perceived a lack of cooperation by the District in providing information on pending cases and a substantial reduction in business from the District after September 2002.

[8] The government claim letter asserted "economic loss and personal injury" to plaintiffs as a result of infliction of emotional distress, violation of federal civil rights, violation of state constitutional rights and law, conspiracy to violate civil rights, breach of covenant of good faith and fair dealing, breach of contract, violation of public policy, retaliation for exercising constitutional rights and violation of the right to pursue a livelihood on the part of Hall, Calhoun, Gonzales and Beeman.

[9] Hall testified, "it's kind of hard if you know that your attorney is suing you. I mean I don't think you would refer a claim to the attorney that's suing you to figure out if it's right for him to sue you or not."

# PROCEDURAL HISTORY

Plaintiffs filed this action in November 2003. As to the District, plaintiffs sought recovery for wrongful retaliation and termination in violation of public policy. As to the individual defendants, plaintiffs sought recovery for violation of federal civil rights under color of state law and conspiracy to violate rights.

The trial court sustained a demurrer by the District without leave to amend. The case went to trial against the eight individual defendants on claims for violation of federal civil rights and conspiracy to violate rights.

After the close of plaintiffs' case-in-chief, the individual defendants moved for a nonsuit. The court granted a nonsuit only as to defendants Quijada-Barrera, Shipp, Sharif and Patillo.

The trial continued as to defendants Hall, Calhoun, Gonzales and Beeman, and the jury returned verdicts in their favor. The jury found on stipulated special verdict forms that defendants Hall, Calhoun, Gonzales and Beeman did not intentionally seek to deprive plaintiffs of their rights of freedom of expression.

The trial court denied plaintiffs' subsequent motions for new trial and judgment notwithstanding the verdict. The court determined plaintiffs failed to show the evidence was insufficient to justify the verdict and that the jury found plaintiffs "failed to prove their case, based upon conflicting evidence which permitted the jury to reject [plaintiffs'] explanation of [defendants'] motivations."

Having prevailed on their motion for nonsuit, defendants Quijada-Barrera, Shipp, Sharif and Patillo requested $168,671 in attorney fees against plaintiffs under title 42 United States Code section 1988. The court found plaintiffs' action was frivolous, unreasonable or without foundation as to these defendants and awarded apportioned fees of $119,257.[10]

---

[10] The trial court found that defendants Quijada-Barrera, Shipp, Sharif and Patillo were named as defendants merely "because they were members of the board and because they refused to acquiesce to demands either unsupported by persuasive evidence or because they relied upon their counsel's advice regarding the requirement that continued representation by [plaintiffs] constituted an attorney-client conflict. In other words, they acted in a manner consistent with the law. [¶] Despite the correctness of [these defendants'] decision not to acquiesce to an unsubstantiated demand and/or continue to be represented by attorneys that were suing them, they were forced to defend against allegations that they were co-conspirators in an unlawful conspiracy. Indeed, when requested by the court, [plaintiffs] could not point to a deprivation of any single right conferred by the Constitution that came as a result of these

Plaintiffs timely appealed from the judgment, the order granting nonsuit, the order denying their motion for judgment notwithstanding the verdict and the order awarding attorney fees to defendants Quijada-Barrera, Shipp, Sharif and Patillo.

## DISCUSSION

### 1. *Order Granting Nonsuit*

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) However, a mere scintilla of evidence does not create a conflict for the jury's resolution, for there must be substantial evidence to create the necessary conflict. (*Ibid.*) A reviewing court will not disturb a nonsuit order when there is no substance to the plaintiff's evidence upon which reasonable minds could differ. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].)

A person "subjects" another to the deprivation of a constitutional right, within the meaning of title 42 United States Code section 1983, if he or she does an affirmative act; participates in another person's affirmative acts; or omits to perform an act that he or she is legally required to do, causing the deprivation of which the plaintiff complains. (*Johnson v. Duffy* (9th Cir. 1978) 588 F.2d 740, 743.) Such causal connection can be established by direct personal participation in the deprivation or by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. (*Id.* at pp. 743–744.)

In the present case, the trial court granted a nonsuit to defendants Quijada-Barrera, Shipp, Sharif and Patillo after inquiring of plaintiffs' counsel what evidence plaintiffs had to connect those defendants to any alleged conspiracy. Specifically, the court sought any evidence that those defendants had knowledge of plaintiffs' accusations prior to the board's receipt of plaintiffs' government claim. The court asked plaintiffs' counsel: "I'm asking you to

---

[defendants'] actions. [¶] [D]ue to the complex nature of the litigation, the defense was costly despite the obvious lack of wrongdoing by these [defendants]."

point to some evidence from which an inference can be drawn . . . to show that between September '02 and May '03 . . . these particular defendants, Shipp, Sharif, Quijada-Barrera and Patillo, were engaged in some act alleged in the complaint that involves a conspiracy. Because even Mr. Jones testified that he did not discuss the dwindling of cases or the lack of receiving cases or the lack of receiving work during that time period with any of those board members. There's no evidence that anyone has discussed that issue. As a matter of fact, there's—I don't want to weigh it, but it's hard for me not to, that financially they were in the same position in May of '03 as they were the year before in terms of billings. So I'm looking for something I can draw an inference from. I'm required to do that."

In response, plaintiffs' counsel could point to no direct evidence and only vaguely referred to "cumulative evidence that shows that the *availability of the knowledge* was there." (Italics added.) Counsel further complained that information had not been disclosed by defendants under the Ralph M. Brown Act (Gov. Code, § 54950 et seq.). The court, however, took judicial notice that, under the act, "even if you're in closed session . . . [t]here still has to be an agenda item" and plaintiffs had proffered no evidence such matters were discussed. At trial, therefore, plaintiffs failed to show any evidence implicating these defendants.

On appeal, the only evidence plaintiffs cite against these defendants is the purported fact that, as members of the board, they did not "reverse" the actions of defendants Hall, Calhoun, Gonzales and Beeman or investigate plaintiffs' May 2003 claim. Plaintiffs apparently argue that defendants' claimed failure to intervene or to investigate the government claim was sufficient evidence that all of the individual defendants participated in the deprivation of plaintiffs' constitutional rights. We disagree.

■ A public official does not condone or ratify an alleged violation of civil rights merely by allowing a claim for an alleged violation to be litigated. Moreover, there is no evidence in this case that, once a government claim was made, the claim itself was handled in a manner that violated plaintiffs' civil rights. We accordingly affirm the court's order granting the nonsuit.

## 2. *Order Denying Motion for Judgment Notwithstanding the Verdict*

Plaintiffs contend the trial court erred in denying their motion for judgment notwithstanding the verdict. They assert there is no substantial evidence supporting the jury's conclusion that defendants did not intentionally seek to deprive plaintiffs of their rights to freedom of expression. We disagree.

A trial court is governed by well-settled standards in determining whether to grant a motion for judgment notwithstanding the verdict (JNOV). "The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict. [Citations.] On appeal from the denial of a motion for JNOV, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citation.]" (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057–1058 [103 Cal.Rptr.2d 790].)

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.] [¶] 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) An appellant has the duty to summarize the facts fairly in light of the judgment, and such duty " 'grows with the complexity of the record.' " (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50 [37 Cal.Rptr.3d 221].)

Plaintiffs claim that no substantial evidence supports defendants' contention that their actions to reduce plaintiffs' services between September 2002 and June 2003 were taken to reduce expenditures for legal services in general rather than in retaliation for plaintiffs' exercise of their constitutional rights. The evidence shows otherwise. Gonzales and Beeman testified they did not believe plaintiffs' services *were* diminished between September 2002 and June 2003. They testified that if plaintiffs' legal services were diminished it was because the District was trying to reduce legal expenses by having more work done in-house.

Plaintiffs claim that their contract was renewed in June 2002 and their hourly rate was increased to influence them to make a political contribution. They cite no evidence demonstrating this in fact was the case. Jones admitted at trial that he had only "speculation" that Hall influenced the decision to

renew Jones & Matson's contract. Jones's partner, Matson, testified he had no personal knowledge of the matter, and he admitted his belief that Hall had a pivotal role in the renewal was based solely upon "my speculation."

Jones claimed that Hall was the "swing vote" in the contract renewal. But, he acknowledged at trial that he learned the vote was actually five to two in favor of renewal, i.e., there was no "swing" vote.

Jones further testified he understood Calhoun had "some misgivings" about the renewal but that Hall "brought her along." The evidence, however, was that Calhoun voted *against* the renewal, and no one tried to talk her into voting for it. Quijada-Barrera, who provided the other negative vote, testified she wanted to know more about Jones & Matson's track record before renewing its contract and no one attempted to persuade her to vote otherwise. Hall stated he did not recall ever telling Jones the firm needed a new contract or discussing the signing of a new contract with Jones before the contract was renewed in June 2002. Hall only learned of the contract renewal several days before the board meeting when it was listed as an agenda item. He testified he did not discuss the need to renew the contract with anyone else on the board before the board meeting.

Gonzales and Beeman, moreover, stated the idea for the renewal of Jones & Matson's contract originated with them. The renewal resulted from the board's general desire to have a direct relationship with its vendors once the District emerged from state control. Beeman testified that Jones & Matson's rate was increased at that time to bring it more in line with the marketplace.

Plaintiffs contend there was no evidence of any change in the District's financial condition between June or July 2002 and September 2002 causing defendants to reduce the District's legal expenses in general and fees to Jones & Matson in particular. However, with the resumption of local control, Gonzales testified he had more accountability for contract expenditures and so he regularly reviewed bills from attorneys and other vendors to ensure the District did not create the same financial conditions that had required the prior state takeover. Reviewing the billings, Gonzales became concerned about the amount of money being spent on bills from Jones & Matson. The board had imposed an $800,000 cap for Jones & Matson's legal fees in the 2002–2003 budget. Beeman attributed any reduction in work sent to Jones & Matson for that year to the District's doing more work in-house and a general improvement in the professionalism of the District's staff requiring fewer disciplinary actions against employees. The law firm had still billed the District an average of $80,000 per month during this period. A reasonable jury could infer the need for fiscal responsibility was a sufficient basis for any reduction of business sent to Jones & Matson.

Plaintiffs further contend that the only significant event occurring just prior to September 20, 2002, was Hall's and Calhoun's run for the Compton City Council and plaintiffs' failure to make a political contribution to their campaign. They rely on an alleged chain of events as convincing evidence of retaliation. Plaintiffs also complain they received disparate treatment,[11] were subjected to allegedly retaliatory remarks and received inconsistent or contradictory explanations for the District's actions. But, all of such matters were before the jury as finder of fact, and the jury determined upon conflicting evidence that there was no intentional deprivation of plaintiffs' constitutional rights. Substantial evidence supports the jury's verdict, and we cannot say the jury was mistaken as a matter of law.

Finally, plaintiffs argue defendants as a matter of law could not reduce or terminate plaintiffs' services by reason of their May 2003 government claim.[12] Citing *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525 [28 Cal.Rptr.2d 617, 869 P.2d 1142] (*Woodside*), overruled by statute on other grounds as recognized in *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077 [29 Cal.Rptr.3d 234, 112 P.3d 623], plaintiffs assert that attorneys may not be terminated, forced to withdraw from employment or terminated by a public agency solely or chiefly because they have engaged in a protected activity. *Woodside* is inapposite, however. *Woodside* concerned the limited question whether an attorney's lawsuit to enforce rights granted pursuant to a statutory scheme of *public employer-employee bargaining* is fundamentally incompatible with the essentials of an employee attorney's duty of loyalty to his or her public employer. (*Woodside*, at p. 549.) *Woodside* is not helpful to plaintiffs since it merely articulated a limited exception to Code of Civil Procedure section 284, prohibiting public employers from punishing attorney *employees* for exercising their statutory rights of collective bargaining. (*Woodside*, at p. 557.)

■ *Woodside* noted, "[w]e do not . . . approve the general proposition that an attorney suit against a present client is ethically permissible. When the attorney is an independent contractor, and when no statute protects an attorney's employment rights, it may well be the case that the attorney's general duty of loyalty dictates that the attorney not sue the present client . . . ." (*Woodside, supra*, 7 Cal.4th at p. 553, fn. 8.) The Supreme Court further

---

[11] Caps were also imposed on the District's two other law firms. Plaintiffs assert the other law firms exceeded their caps and were not terminated, nor were memos sent cautioning employees against consulting the other firms without prior authorization. Nonetheless, there was no evidence that District staff informally consulted the other firms with the same frequency or extent to which they had become used to consulting Jones & Matson. Rather, the evidence was otherwise.

[12] Whether the District breached its contract by failing to give a 30-day notice of termination is not before us, nor did plaintiffs plead a breach of contract in their complaint.

reiterated the general principle, codified in Code of Civil Procedure section 284, conferring upon clients " the '[absolute] power to discharge an attorney, with or without cause' " (*Woodside*, at p. 555, quoting *Fracasse v. Brent* (1972) 6 Cal.3d 784, 790 [100 Cal.Rptr. 385, 494 P.2d 9]), recognizing that " ' "the interest of the client in the successful prosecution or defense of the action is superior to that of the attorney, [such that the client] has the right to employ such attorney as will in his opinion best subserve his interest" ' " (*Woodside, supra*, at p. 555).

*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164 [32 Cal.Rptr.2d 1, 876 P.2d 487], upon which plaintiffs also rely, was a pleading case with limited application here. The Supreme Court merely held that an *in-house counsel* may maintain a retaliatory discharge claim against his or her employer to the same extent as a nonattorney employee under certain circumscribed circumstances. (*Id.* at pp. 1169, 1189–1192.) In so holding, the Supreme Court *reaffirmed* "the primacy of fiducial values and its corollary: the unilateral right of the client to sever the professional relationship at any time and for any reason." (*Id.* at p. 1174.)

3. *Attorney Fees*

■ Under title 42 United States Code section 1988(b), the court in its discretion may award a party prevailing under title 42 United States Code section 1983 "a reasonable attorney's fee as part of the costs." Cases interpreting that statute have limited such awards to a prevailing defendant to situations in which the plaintiff's civil rights claim is "frivolous, unreasonable, or groundless, or [if] the plaintiff continued to litigate after it clearly became so." (*Christiansburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 422 [54 L.Ed.2d 648, 98 S.Ct. 694] (*Christiansburg*); see *Thomas v. City of Tacoma* (9th Cir. 2005) 410 F.3d 644, 647–648; see also *Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383, 1387–1388 [15 Cal.Rptr.2d 53] (*Cummings*).)

In this case, defendants Quijada-Barrera, Shipp, Sharif and Patillo asserted there was no evidence whatsoever that they took any action in retaliation for plaintiffs' exercise of their right to free speech. In a written order, the trial court made detailed findings and concluded the moving defendants met the applicable standard under *Christiansburg*. The court found that plaintiffs' interactions with defendants Gonzales, Beeman, Hall and Calhoun were the main focus of the trial and formed the gravamen of the claimed discriminatory and retaliatory acts.

The record supports the trial court's exercise of discretion in granting attorney fees to Quijada-Barrera, Shipp, Sharif and Patillo. Plaintiffs' counsel admitted there was no direct evidence tying them to any claimed violation of civil rights. There was no evidence at trial that they had knowledge of alleged wrongdoing by other defendants prior to plaintiffs' submission of a government claim. On more than one occasion before trial, defense counsel asked plaintiffs' counsel to dismiss these defendants. Plaintiffs' counsel indicated he would consider dismissing them but never did so, forcing the four individuals to endure a trial. Plaintiffs' counsel even indicated those defendants probably would have been voluntarily dismissed before the case went to the jury had the court not granted their motion for nonsuit. Nevertheless, plaintiffs continued to litigate their claims against the moving defendants after it should have become obvious that plaintiffs' claim was frivolous, unreasonable or groundless. (See *Cummings, supra,* 11 Cal.App.4th at p. 1390.)

The trial court heard the evidence, observed the demeanor of the parties and witnesses, and was in the best position to determine whether attorney fees were warranted under the circumstances. We find no abuse of discretion in the award of attorney fees.[13]

### 4. *Cross-appeal*

Defendants Hall, Calhoun, Beeman and Gonzales argue on cross-appeal that the trial court should have granted their motions for nonsuit on the grounds that (1) defendants had qualified immunity; (2) plaintiffs failed to state a cause of action for conspiracy; and (3) as policy makers and holders of confidential positions, plaintiffs were not entitled to bring a First Amendment retaliation action.

We do not address defendants' protective cross-appeal since only a party who is aggrieved may appeal from a judgment or appealable order. (Code Civ. Proc., § 902.) A party is not "aggrieved" by a judgment or order rendered in his or her favor. (*Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 211 [40 Cal.Rptr.3d 92].) Because we affirm the judgment and the trial court's orders, we dismiss the cross-appeal as moot. (*California Court Reporters Assn. v. Judicial Council of California* (1997) 59 Cal.App.4th 959, 961 [69 Cal.Rptr.2d 529]; *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 533, fn. 22 [63 Cal.Rptr.2d 118].)

---

[13] Plaintiffs do not contest the reasonableness of the attorney fees awarded and challenge only the fact such fees were awarded at all.

## DISPOSITION

The judgment and the orders of the trial court are affirmed, and the cross-appeal is dismissed. Defendants are to recover their costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied January 3, 2008, S158302. Werdegar, J., did not participate therein.