Filed 5/5/14  Marriage of Pasulka CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of KATHLEEN and ROBERT PASULKA. | D062039 |
| KATHLEEN PASULKA, | |
| Respondent, | (Super. Ct. No. D502885) |
| v. | |
| ROBERT PASULKA, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lorna A. Alksne, Judge.  Affirmed.

Robert Pasulka, in pro. per., for Appellant.

Kathleen Pasulka, in pro. per.; Stephen Temko for Respondent.

Robert Pasulka appeals the judgment dividing community assets and liabilities in this marital dissolution proceeding.  He contends that the trial court made more than a dozen errors on issues ranging from judicial bias, to selecting an alternate valuation date for the family business, to finding that he breached his fiduciary duty to his wife Kathleen

by helping his brother secretly encumber the marital residence with a judgment lien for a debt that had already been repaid. We conclude that Robert has forfeited many of the issues that he raises on appeal because he either failed to properly preserve them below or failed to comply with rules of appellate procedure. For those issues that we reach on the merits, we conclude that Robert has failed to show that the trial court erred. We therefore affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL SUMMARY

*A.* *The Marriage*

Kathleen and Robert married on June 18, 1994 and separated on January 1, 2007. They had no children together, but Kathleen had two sons from a prior marriage (Spencer and Jordan Rabin). Kathleen filed a petition for dissolution on April 18, 2007.

Kathleen and Robert were both lawyers when they married. Kathleen was an intellectual property lawyer at a prominent San Diego law firm. Robert's practice involved bankruptcy reorganization, partnership and corporate dissolutions, title work, and real estate litigation. Robert's license to practice law went to inactive status in 2006 or 2007.

At some point during the marriage, the parties agreed that Kathleen would continue practicing law and Robert would pursue other business ventures. One of those ventures was Pacific RO,[1] a distributor of water purification products, which Robert

---

[1] "RO" stands for reverse osmosis.

began in 1998. Pacific RO was a sole proprietorship run primarily by Robert, with occasional input from Kathleen. Robert was the company's only employee.

Several of Robert's relatives were involved in similar businesses. His brother, William, ran Midwest RO in Illinois; William's son-in-law ran American RO in Kentucky; and another brother, Joe, ran Atlantic RO in North Carolina. Robert even helped Kathleen's adult son, Spencer, run Western RO during the marriage, but that business later shut down. The family RO businesses transferred funds and inventory among each other, and all had the same trade dress and slogans. As of the date Kathleen and Robert separated, Robert had borrowed approximately $630,000 from William in the form of money and product.

B.      *The Residence*

After Kathleen and Robert separated, they decided to repair and remodel their residence in anticipation of selling it. Robert, who still lived in the residence with one of Kathleen's sons, oversaw the renovation project. Kathleen contributed $28,000 toward the expenses associated with the residence during the renovation. Kathleen's son moved out in July 2007. The renovation was completed in October 2007 at a total cost of approximately $96,000.

For unspecified reasons, the parties did not sell the residence following completion of the renovation. Kathleen's counsel notified Robert that because he was living in the residence alone, Kathleen would no longer contribute toward the expenses for the residence. Because Robert was unable to afford the residence on his own, he moved out in January 2008 and Kathleen moved in a few months later. She paid all of the expenses

3

associated with the residence through 2009. Beginning in January 2010, however, Kathleen was no longer able to afford the mortgage on her own due to expenses that she was incurring in this and related litigation, which we discuss, *post*. She requested that Robert pay half of the mortgage, but he refused. Kathleen attempted to make half payments to her mortgage company, but it rejected the partial payments.

## C. *William and Melanie Pasulka Sue Kathleen and Robert*

Robert encouraged Kathleen to acknowledge and accept personal liability for the debts owed to William.[2] On March 27, 2008, Kathleen notified Robert that she would not consent to granting William a lien against the residence. On April 2, William and his wife, Melanie, filed a complaint for breach of contract against Robert and Kathleen in San Diego Superior Court (*Pasulka I*). Five days later, without Kathleen's knowledge, Robert stipulated to entry of judgment against himself in the amount of approximately $702,000. As a result of Robert's stipulation, William and Melanie obtained a judgment lien in the approximate amount of $704,000 against the residence. After the lien was recorded, but before Kathleen learned of the lawsuit or the lien, Robert suggested to Kathleen that they stipulate to sell the residence and pay off trust deeds and "other liens

---

[2] At times, the encouragement bordered on extortion. Robert sent Kathleen several messages in which he threatened to disclose private information about her if she did not agree to his proposed terms of settlement. In one e-mail, Robert wrote, "If you don't agree within 24 hours" to "sign a note and deed of trust for my brother Bill in the amount of the $628,701 . . . , I will post a web page which describes your behavior both before and after you moved out. I will send a link to your family members, your friends, and others." When Kathleen did not respond, Robert sent a three-page e-mail to two of Kathleen's relatives in which Robert made derogatory statements regarding Kathleen's private health, medical, and financial information. A few weeks later, Robert forwarded the message to more of Kathleen's relatives. Robert also sent a similar, eight-page letter to several of Kathleen's law firm partners.

4

of record existing as of the date of th[e] Stipulation." Kathleen did not agree to this proposal.

Kathleen first learned of *Pasulka I* on June 2, 2008, when she received an e-mail from William and Melanie's counsel attempting to coordinate service of process. Just over a month later, Kathleen was finally served with documents relating to the lawsuit, including Robert's stipulated judgment. It was then that she first learned of the lien against the residence.

Kathleen unsuccessfully sought to stay *Pasulka I* on the basis that it created a jurisdictional conflict between the civil court and the family court. She also unsuccessfully pursued two writ petitions to this court seeking similar relief. A jury eventually returned a verdict in favor of William and Melanie in October 2009, and a judgment in the amount of $299,000 was entered against Kathleen in February 2010.

Kathleen successfully moved for judgment notwithstanding the verdict in July 2010. Judge John S. Meyer concluded that Robert had already repaid William for the debt on which William and Melanie had sued Kathleen and Robert. William and Melanie appealed, and ultimately settled with Kathleen in November 2011.

In the meantime, on September 10, 2010, William and Melanie sued Kathleen and Robert a second time (*Pasulka II*). Once again, Robert stipulated to entry of judgment against him, this time in the amount of $794,000. Although the stipulated judgment initially resulted in another lien against the residence, Judge Timothy B. Taylor vacated the underlying judgment and stayed the case after he found that Robert, William, and

Melanie had "cooked up" *Pasulka II* to "foul up" the dissolution proceedings by making things difficult and expensive for Kathleen.

D.      *Robert Sues Kathleen and Her Son*

In December 2008, Robert sued Kathleen and her adult son, Spencer Rabin, for money that he and Kathleen had loaned to Spencer in connection with Western RO. In 2011, the parties settled by way of a stipulated judgment in the amount of $230,000, but agreed to defer enforcement of the judgment until the dissolution case was final.

E.      *Robert Sues Kathleen, Her Employer, and Every Lawyer Who Represented Her*

In March 2009, Robert sent a letter to Kathleen's law firm and several of its partners threatening to sue the firm if it did not stop representing Kathleen. On the same day that Robert's letter arrived, the firm laid off the attorney who was representing Kathleen.[3] Robert sued Kathleen, her law firm, and every lawyer who had represented her, but ultimately dismissed the lawsuit.

F.      *OSCs Regarding the Residence and Discovery*

In May 2010, Robert filed an order to show cause (OSC) seeking to compel the sale of the residence. The court denied the OSC in June 2010. During an August 2, 2010 hearing, Judge Patricia Garcia directed the parties to each pay half of the mortgage arrearages and half of the monthly payments going forward. A few weeks later, Robert filed another unsuccessful OSC seeking to compel the sale of the residence.

In February 2011, Kathleen filed an OSC seeking permission to borrow from her 401(k) retirement plan to pay her half of the mortgage arrears and also to pay her

---

[3]     That attorney continued to represent Kathleen.

attorney. Robert opposed Kathleen's OSC and later filed an OSC of his own seeking, among other things, an order requiring the sale of the residence and an order regulating discovery. The hearing on the OSCs was continued from April to May, during which time the case was reassigned to family law Presiding Judge Lorna Alksne. After another short continuance, Judge Alksne began hearing the dueling OSCs on May 9. The court permitted Kathleen to borrow from her 401(k) to bring the mortgage current and also permitted her to seek reimbursement from Robert for any of those funds that Kathleen used to pay his half of the mortgage and taxes. The court ordered each of the parties to continue paying one-half of the mortgage, by the first day of each month. Judge Alksne stated that she intended to contact Judge Meyer, who had presided over *Pasulka I*, and Judge Taylor, who presided over *Pasulka II*, regarding the dissolution case.

The court heard the remaining issues raised in the parties' respective OSCs on May 17, 2011. The court (1) allowed Kathleen to borrow additional funds from her 401(k) to pay a portion of her attorney fees, (2) denied Robert's request for an order compelling the sale of the residence, and (3) appointed retired judge William Howatt as discovery master. The court stated that Judge Howatt would "regulate the discovery and . . . make a recommendation to [the court] which deposition will go first, what duration, and then look at the outstanding discovery and . . . make a recommendation to th[e] court as to what is pending, who has complied and who has not." The court ordered the parties to pay for Judge Howatt's time equally.

On July 6, 2011, Robert filed an OSC requesting that the court modify its order requiring him to pay half of the monthly mortgage payments. Approximately two weeks

later, Kathleen filed an OSC seeking to hold Robert in contempt for failing to pay his half of the June and July mortgage payments. At an August 23 hearing, the court advised Robert of the quasi-criminal nature of contempt proceedings, the potential consequences, and his right to counsel. Robert elected to represent himself and entered a plea of not guilty. The court denied Robert's motion to modify, and eventually dismissed Kathleen's OSC regarding contempt on January 17, 2012.

## G. *Alternate Valuation Date for Pacific RO*

On May 20, 2011, Kathleen moved the court for an order valuing Pacific RO as of the date of separation instead of as of the date of trial, as is the usual practice. (Fam. Code, § 2552.)[4] Over Robert's opposition, the court granted Kathleen's motion in July 2011.

## H. *The Discovery Master's Reports and Recommendations*

After conducting discovery hearings in September 2011, Judge Howatt issued two reports. In one report, Judge Howatt recommended that the court sanction Robert in the amount of $50,000 plus $7,000 for costs, as a result of Robert's conduct. Judge Howatt reported, "[T]here can be no doubt that [Robert] has achieved his shameful and sinister purpose of causing financial and emotional harm to [Kathleen] by designedly and purposefully frustrating settlement and causing unnecessary and prolonged litigation which has continued over the last four and one-half years."

In the other report, Judge Howatt recommended that Robert be required to produce certain documents and answer supplemental interrogatories by September 13, 2011.

---

4      All undesignated statutory references are to the Family Code.

8

Judge Howatt also recommended that Kathleen's requests for admission to Robert be deemed admitted. Judge Howatt reported that Robert had withdrawn his request to depose Kathleen,[5] and recommended certain parameters for Kathleen's deposition of Robert.

The court adopted Judge Howatt's recommendations on October 6, 2011.

I.    *Trial Proceedings*

Kathleen filed a motion in limine seeking to exclude Robert's evidence on a variety of issues on the ground that Robert had failed to comply with Judge Howatt's discovery orders. One of the issues was third-party debts that Robert contended he and Kathleen owed to his sister, Mary Knapp, and to a friend, Tom Mullins. Robert contended that he had produced all discovery, but conceded he had not done so in a timely manner. The court reserved ruling on the motion until Robert offered particular evidence at trial.

On the first day of trial, Robert requested that the court take judicial notice of certain deeds and deeds of trust pertaining to the residence, an abstract of judgment from *Pasulka I*, and notices of federal and state tax liens. Robert argued that the deeds established that he and Kathleen each held a one-half interest in the residence as their respective separate property, and not as community property, as the parties had agreed throughout the course of the litigation. The court admonished Robert for his "last-minute

---

5    Apparently, Judge Alksne had resolved the parties' dispute regarding deposition priority back in June 2011.

change in the case," which the court characterized as "unfair." The court deferred ruling on the request, and ultimately denied it at the close of trial.

Trial commenced on October 17, 2011. The court heard live testimony from Robert, Kathleen, and their respective experts regarding valuation of both the residence and Pacific RO. The court bifurcated the issue of spousal support. The court announced its tentative ruling on October 20, and the parties waived closing argument. Kathleen submitted a proposed judgment, to which Robert objected. The court entered judgment on March 9, 2012.

In the judgment, the court (1) found that the residence was presumptively community property; (2) ruled that Robert had breached his fiduciary duty to Kathleen by virtue of his conduct in connection with *Pasulka I*; (3) awarded the entire residence to Kathleen as a remedy for Robert's breach of fiduciary duty; (4) ordered that the parties each pay one-half of the expenses incurred in renovating the residence, taking into account the $28,000 that Kathleen had already paid; (5) found that Pacific RO was presumptively community property and valued it at zero; (6) awarded to Robert all assets, debts, and liabilities of Pacific RO; (7) ruled that Kathleen had no post-separation obligations arising from Pacific RO and was not obligated on any loans made by Robert's relatives; (8) awarded each party half of the judgment obtained against Spencer Rabin; (9) denied Robert's claims regarding third-party debts to Mary Knapp and Tom Mullins, as a result of the court's exclusion of documents that Robert had failed to timely produce during discovery; and (10) found that Robert was not a credible witness.

Robert appealed the judgment on May 7, 2012.

10

## II.

## APPELLANT'S BURDEN ON APPEAL, GENERALLY

On appeal, the judgment of the trial court is presumed to be correct. (*Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564 (*Denham*).) Accordingly, if the judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning. (*Estate of Beard* (1999) 71 Cal.App.4th 753, 776-777; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19.) If the appellate court affirms the judgment on certain grounds, it generally need not address alternative grounds for affirmance. (*Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513 (*Sutter*).) All intendments and presumptions are made to support the judgment on matters as to which the record is silent. (*Denham*, *supra*, at p. 564.)

An appellant's opening brief must "[p]rovide a summary of the significant facts limited to matters in the record." (Cal. Rules of Court, rule 8.204(a)(2)(C).)[6] "An appellant has the duty to summarize the facts fairly in light of the judgment, and such duty ' "grows with the complexity of the record." ' [Citation.]" (*Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596, 1607.) "[T]he leading California appellate practice guide instructs about this: 'Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations and/or material omissions of the

---

6    Further rule references are to the California Rules of Court.

relevant facts or law can instantly "undo" an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!' [Citation.]" (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531.)

An appellant has the burden to provide an adequate record and affirmatively show reversible error. (*Denham*, *supra*, 2 Cal.3d at p. 564; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 (*Ballard*).) If an appellant does not provide an adequate record to support a contention of insufficiency of the evidence to support a finding, that contention may be deemed waived. (*Aguilar v. Avis Rent A Car System*, *Inc.* (1999) 21 Cal.4th 121, 132.) Furthermore, it is the appellant's duty to support arguments in his or her briefs by references to the record on appeal, including citations to specific pages in the record. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 (*Duarte*).) "Failure to set forth the material evidence on an issue waives a claim of insufficiency of the evidence." (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96.) If an argument is not supported with necessary citations to the record on appeal, that portion of the brief may be stricken and the argument may be deemed waived. (*Duarte*, *supra*, at p. 856.)

Because the arguments on appeal must be restricted to evidence in the record, any reference to matters outside the record on appeal generally will not be considered. (Rule 8.204(a)(2)(C); *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 453, fn. 6.) Furthermore, "[a]ppellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.

12

[Citations.]' [Citaiton.]" (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 (*Nelson*).) "We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone*).)

Finally, we observe that Robert, as an in propria persona litigant, is "entitled to the same, but no greater, consideration than other litigants and attorneys. . . . Further, the in propria persona litigant is held to the same restrictive rules of procedure as an attorney." (*Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113, 1125-1126.)

III.

DISCUSSION

Robert contends that the trial court committed more than a dozen errors. In one way or another, each of his contentions runs afoul of the appellate principles outlined above.[7] To the extent that we have examined the merits of Robert's contentions despite his failure to comply with these principles, they fail for the reasons discussed below.

A.    *Hostility by Judge Alksne*

Robert contends that Judge Alksne committed error by being "hostile" to him. However, he fails to cite to any place in the record where he raised this issue with the

---

[7]    Robert has forfeited his arguments in part  III., B-E, H-J, L, and N, *post*, by failing to support them with sufficient citations to record evidence and legal authority. (*Denham*, *supra*, 2 Cal.3d at p. 564; *Ballard, supra*, 41 Cal.3d at p. 574; *Duarte, supra*, 72 Cal.App.4th at p. 856; *Nelson, supra*, 172 Cal.App.4th at p. 862; *Falcone, supra*, 164 Cal.App.4th at p. 830.) The additional bases upon which Robert forfeited certain challenges are discussed in connection with the specific challenges to which they are applicable.

trial court. On that basis, he has forfeited the issue on appeal. (*People v. Samuels* (2005) 36 Cal.4th 96, 114 ["Failure to raise the issue of judicial conduct at trial waives claims of statutory or constitutional error"]; *Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1028, 1038 (*Camacho*) ["appellant's disqualification arguments are forfeited by his failure to raise them below"].) Not only did Robert fail to raise the issue with the trial court, but he also failed to seek prompt writ review, as required. (*People v. Mayfield* (1997) 14 Cal.4th 668, 811 ["Under our statutory scheme, a petition for writ of mandate is the exclusive method of obtaining review of a denial of a judicial disqualification motion"]; Code Civ. Proc., § 170.3, subd. (d) ["The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding"].)

Even if Robert had properly preserved this issue, we would nonetheless conclude that it lacks merit. For example, Robert's assertion that "Judge Alksne threatened to put Robert in jail" grossly mischaracterizes the record. Rather than threatening Robert, Judge Alksne was advising Robert of the quasi-criminal nature of the pending contempt proceeding to ensure that he was fully aware of the potential consequences before electing to represent himself.

Robert further mischaracterizes the record when he asserts that "Judge Alksne called another deputy into the courtroom to further intimidate Robert." Although Robert contends that the record shows that he did not "threaten," "curse at," or "approach" the

14

judge, the record establishes that Judge Alksne observed that Robert "didn't seem under control" and was smirking and failing to take matters seriously.

Robert offers as a further example of judicial hostility that Judge Alksne "berated" him at a May 9, 2011 hearing for failing to keep current on the mortgage, as directed by Judge Garcia. Robert ignores the fact that moments later, Judge Alksne also admonished Kathleen for failing to pay her half. Robert has failed to establish error.

B.      *Alternate Valuation Date for Pacific RO*

Robert contends that the trial court erred when it granted Kathleen's motion to value Pacific RO as of the date of separation rather than as of the time of trial, because, he claims, Kathleen failed to establish any of the exceptions that justify an alternate valuation date. We disagree.

*1.      Governing Legal Principles*

Section 2552, subdivision (a), establishes as the general rule that "[f]or the purpose of division of the community estate upon dissolution of marriage or legal separation of the parties, except as provided in subdivision (b), the court shall value the assets and liabilities as near as practicable to the time of trial." The referenced exception in subdivision (b) provides that "the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner." (§ 2552, subd. (b).)

Courts have generally found that good cause exists to value professional practices and small businesses as of the date of separation when the business's value "devolves

15

largely from the personal skill, industry and guidance of the operating spouse, as opposed to its capital assets." (*In re Marriage of Stevenson* (1993) 20 Cal.App.4th 250, 254 (*Stevenson*); *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 625 (*Duncan*).) Courts have also applied the exception "when either spouse dissipates the community estate after separation" (*In re Marriage of Barnert* (1978) 85 Cal.App.3d 413, 423), and when poor recordkeeping prevents a postseparation valuation (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1551). "Valuing the business as of the date of separation also relieves the concern the operating spouse might deliberately 'trash' the business prior to the date of trial . . . ." (*Stevenson*, *supra*, at pp. 254-255.)

"Family Code section 2552, subdivision (b) gives the trial court considerable discretion to divide community property in order to assure an equitable settlement is reached." (*Duncan*, *supra*, 90 Cal.App.4th at p. 625.) "Where, as here, the trial court is vested with discretionary powers, we review its ruling for an abuse of discretion." (*Ibid*.) "As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it." (*Ibid*.) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

### 2. *Analysis*

Substantial evidence supports the trial court's decision to value Pacific RO as of the date of separation under the small business exception. Pacific RO was a sole proprietorship with Robert as its only employee. The business was dependent on

16

Robert's personal relationship with William and his other brothers. These relationships allowed Robert to purchase inventory at cost, to obtain large amounts of credit, and to ship product to customers from his brothers' locations. Robert advertised on the Internet that, "Our family owned companies are collectively the largest privately-owned distributors of water purification filters in the U.S. with offices in California, Illinois, Kentucky, and North Carolina." Robert and his brothers' businesses all used similar trade dress and Web sites, including the tag line, "In a Glass by Itself." At one point, Robert and William each had blank checks for the other's business. Not surprisingly, then, Robert conceded at trial that "[t]o the extent Pacific RO has been successful," it is because of Robert's "relationship with the other RO businesses in [his] family . . . ." This constitutes substantial evidence that Pacific RO's value derives in large part from Robert's "personal skill, industry and guidance." (*Stevenson*, *supra*, 20 Cal.App.4th at p. 254.) Accordingly, we conclude that the trial court did not abuse its discretion in valuing Pacific RO as of the date of separation rather than as of the time of trial. Because we have reached this conclusion, we need not consider whether Robert's dissipation of assets, poor recordkeeping, or the possibility that he might "trash" the business also supported the court's selection of an alternate valuation date. (*Sutter*, *supra*, 171 Cal.App.4th at p. 513 ["one good reason is sufficient to sustain the order from which the appeal was taken"].)

C.     *Debts Owed to William and Melanie Pasulka*

Robert contends that the trial court erred in its treatment of pre- and postseparation debts. Specifically, Robert asserts that the court erred by refusing to allow him to testify

at trial regarding Kathleen's obligation on the *Pasulka I* debt and by failing to give him an *Epstein* credit[8] for paying the *Pasulka I* community obligation with postseparation funds. In addition, Robert contends that the court erred by failing to allocate to Kathleen any obligation for postseparation debts owed to William and Melanie (the *Pasulka II* alleged debt) or incurred by Pacific RO.  We are not persuaded.

Judge Alksne explained to Robert at trial that she believed that she lacked jurisdiction to adjudicate the *Pasulka I* debt because Judge Meyer had already adjudicated it and his determination was on appeal.[9]  (See, e.g., Code Civ. Proc., § 916, subd. (a) [subject to certain exceptions, "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby"].)  Because Robert's briefing does not challenge the trial court's jurisdictional ruling, that issue is forfeited on appeal.  (*Nelson*, *supra*, 172 Cal.App.4th at p. 862; *Falcone*, *supra*, 164 Cal.App.4th 814 at p. 830.)

More importantly, however, Kathleen and Robert both testified at trial that Robert had already repaid the *Pasulka I* debt years ago.  Thus, the real issue before the trial court was whether to grant Robert an *Epstein* credit for his postseparation repayment of a community debt.  In that regard, the trial court specifically allowed William to testify—

---

8    " '[A]s a general rule, a spouse who, after separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be reimbursed therefor out of the community property upon dissolution.' "  (*In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84, quoting *In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 747.)

9    This had previously worked to Kathleen's disadvantage when Judge Alksne denied Kathleen's request to remove the *Pasulka I* judgment lien from the residence.

over Kathleen's objection—regarding the *Pasulka I* and other preseparation debts as it related to Pacific RO's valuation, because those debts existed as of the alternate valuation date. Kathleen's valuation expert valued Pacific RO as of December 31, 2006, at between $548,000 and $668,000, but acknowledged that his valuation would be affected by outstanding accounts payable. Similarly, Robert's valuation expert testified that the proper way to value Pacific RO would be to subtract its liabilities from its assets. This would require taking into consideration the outstanding accounts payable. Robert's expert did not offer an opinion on the actual value of Pacific RO, but did value its goodwill at zero. Robert valued Pacific RO's assets at approximately $500,000, and estimated that the *Pasulka I* debt was approximately $640,000 as of the date of separation. Based on this evidence and the formula provided by Robert's expert, the trial court awarded Pacific RO to Robert at a value of zero. This conclusion is supported by the implied finding that the *Pasulka I* debt that Robert paid after separation reduced Pacific RO's value to zero.[10]

Robert's contention that Kathleen was obligated on Pacific RO's postseparation debts also fails. In making this argument, Robert ignores the fundamental consequence of the court's selection of the alternate valuation date for Pacific RO—that any debts, losses, or profits that occurred after the date of separation were Robert's separate property. (§ 2552, subd. (b) ["the court for good cause shown may value all or any

_____

[10]    In other words, the court could properly arrive at a zero valuation by valuing Pacific RO somewhere between Robert's admitted value of $500,000 and Kathleen's expert's estimate of up to $668,000 (before taking accounts payable into account) and then subtracting the *Pasulka I* account payable of $640,000.

portion of the assets *and liabilities* at a date after separation and before trial"], italics added; *Stevenson*, *supra*, 20 Cal.App.4th at pp. 254-255 ["Valuing the business as of the date of separation also relieves the concern the operating spouse might deliberately 'trash' the business prior to the date of trial"].)

D.      *Denial of Robert's Requests to Sell the Residence*

Robert contends that the trial court erred by denying his August 20, 2010 and April 19, 2011 OSCs seeking to compel the sale of the residence. We conclude that there is no error.

The court heard Robert's August 2010 OSC on September 21, 2010. The mortgage was in arrears at the time of the hearings, but the lender had not yet recorded a notice of default. The court advised Robert that "[t]he only time the court steps in to order sale of a house prior to trial is if it is in danger of being lost. I need proof of that. So can you get that?"[11] Robert conceded that no notice of default had been recorded and that his concerns would be assuaged if the arrearages were paid. The court offered to continue the hearing to allow Robert to obtain documentation from the lender, but Robert suggested that the court instead take the matter off calendar without prejudice to his refiling upon receipt of documentation. The court obliged. Robert has failed to offer any

---

[11]     This should not have surprised Robert because the same judge had denied Robert's prior request to sell the residence on the same basis: "This is a trial issue, and the only time the court will act on a temporary basis or prior to the time of trial is if an asset is in jeopardy of being lost. And while you are close, it is uncertain. I do not have from the lender . . . a notice of default . . . . [¶] I may review this issue if at the next review hearing there is a notice of default on the residence."

20

authority or cogent argument that establishes that the court erred in doing so.  (*Nelson*, *supra*, 172 Cal.App.4th at p. 862; *Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

The court heard Robert's April 19, 2011 OSC to sell the residence on May 17, 2011.  In the meantime, on May 9, the court heard Kathleen's OSC seeking permission to borrow from her 401(k) to bring the mortgage current.  During the May 9 hearing on Kathleen's OSC, the court advised the parties that it would "not order the house sold with [the *Pasulka I*] judgment on it, against it, because nobody will buy it."  The parties advised the court that they were exploring with William and Melanie the possibility of removing the judgment lien in order to permit the sale of the residence, with the sale proceeds to be held in a trust account pending judicial determination of the validity and extent of the lien.  The court instructed the parties, "Well, you need to get your brother and sister-in-law and get this deal done by the end of the week if they are willing to do it to get this house sold."  To protect the residence in the meantime, the court granted Kathleen's OSC to bring the mortgage current with funds from her 401(k).[12]  When the court heard Robert's OSC requesting to sell the house the following week, William and Melanie still had not agreed to any alternative arrangement regarding the judgment lien.  Accordingly, the court stated, "I'm not planning on ordering the house sold with a lien on it," to which Robert responded, "Yeah."  Again, Robert has failed to offer any authority

---

[12]     The court reasoned as follows:  "So that house needs to be sold, but I would rather not lose that potential $400,000 in equity that could pay your tax liens off or pay your brother off if the lien is found valid, but we don't want to lose the money to the lender."

21

or cogent argument that establishes that the court erred in exercising its discretion to preserve the residence rather than selling it.

E.    *Compliance with Orders From the Bench*

In an undeveloped argument, Robert asks this court to address whether attorneys—meaning he and Kathleen—were required to comply with oral rulings from the bench that were not reduced to formal written orders. Specifically, Robert appears to suggest that Judge Alksne erred by failing to grant his August 2011 OSC, in which he sought to hold Kathleen in contempt for failing to comply with Judge Garcia's August 2010 direction from the bench that the parties pay the mortgage arrearages. It appears from the reporter's transcript that Judge Alksne discharged Robert's OSC in September 2011 because, although Judge Garcia's direction was memorialized in the court's *minutes*, family court *minutes* do not constitute *minute orders*. We need not reach this issue, however, because Judge Garcia directed Robert in August 2010 to prepare a written order regarding the arrearages, and Robert failed to do so. *(E.g., Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [" 'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal. [Citation.]"].)

F.    *Communication with Other Judges*

Robert contends that Judge Alksne erred when she "spoke to other judges about this case . . . ." This contention fails for several reasons. First, although Judge Alksne stated that she *intended to* speak with the civil judges who had presided over *Pasulka I* and *Pasulka II*, Robert cites no evidence in the record that indicates that Judge Alksne

22

*actually* communicated with any other judge. (*Denham*, *supra*, 2 Cal.3d at p. 564; *Ballard*, *supra*, 41 Cal.3d at p. 574.)

Second, Robert failed to object at the time to Judge Alksne's stated intention, thereby forfeiting the issue on appeal. (*Falcone*, *supra*, 164 Cal.App.4th at p. 826 ["an appellate court will ordinarily not consider procedural defects or erroneous rulings where an objection could have been, but was not raised below"]; *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002 (*Hinman*) ["Failure to object to the ruling or proceeding is the most obvious type of implied waiver"].)

Third, even if Robert had preserved the issue for appeal, he fails to cite any authority that holds that it is improper for judges to communicate among themselves concerning related cases. (*Nelson*, *supra*, 172 Cal.App.4th at p. 862; *Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

Finally, Robert has failed to articulate any prejudice that he has suffered as a result of the alleged error. (*Reid v. Balter* (1993) 14 Cal.App.4th 1186, 1195, quoting *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 ["[I]t is not enough to show that the ruling was indeed erroneous. In addition, the appellant must also 'show resulting prejudice, and the probability of a more favorable outcome, *at trial*.' "].) He likely could not: *Pasulka I* was on appeal and ultimately settled, and *Pasulka II* was stayed.

Robert has failed to establish error.

G.     *Discovery Issues*

Robert makes several claims of error arising from the court's referral of discovery issues to Judge Howatt and the court's adoption of Judge Howatt's proposed orders. To

23

the extent that Robert has not forfeited these claims for the reasons discussed below, we conclude that none of them has any merit.

Robert contends that the trial court erred by ordering the parties to split the cost of the discovery referee equally even though, Robert alleges, the court knew that he could not afford it. Robert never raised this objection with the trial court; to the contrary, he thanked the court for making the referral. Accordingly, Robert has forfeited this issue. (*Falcone*, *supra*, 164 Cal.App.4th at p. 826; *Hinman*, *supra*, 55 Cal.App.4th at p. 1002.)

Robert also now takes issue with the scope of the referral to Judge Howatt. He contends that once Judge Alksne resolved the dispute regarding deposition priority, she should have withdrawn the referral to Judge Howatt. We disagree. First, Robert has forfeited this issue because the record on appeal does not include the order appointing Judge Howatt, which would presumably define the scope of Judge Howatt's assignment. (*Denham*, *supra*, 2 Cal.3d at p. 564; *Ballard*, *supra*, 41 Cal.3d at p. 574.) Second, the reporter's transcript establishes that Judge Howatt's role was broader than Robert asserts. The court charged Judge Howatt with resolving the deposition priority dispute "and then look[ing] at the outstanding discovery and . . . mak[ing] a recommendation to this court as to what is pending, who has complied and who has not." Thus, Robert has failed to establish that the court erred when it did not withdraw the referral to Judge Howatt after the court resolved the deposition priority dispute.

Robert also challenges the manner in which Judge Howatt conducted the discovery hearings. This challenge fails for two reasons. First, Robert failed to raise an objection with either Judge Howatt or Judge Alksne regarding Judge Howatt's alleged

24

bias or hostility, or to seek writ review. (*People v. Samuels*, *supra*, 36 Cal.4th at p. 114; *Camacho*, *supra*, 209 Cal.App.4th at p. 1038; *People v. Mayfield*, *supra*, 14 Cal.4th at p. 811; Code Civ. Proc., § 170.3, subd. (d).) Second, Robert has failed to provide a reporter's transcript of the proceedings that he challenges. (*Denham*, *supra*, 2 Cal.3d at p. 564; *Ballard*, *supra*, 41 Cal.3d at p. 574.)

Robert further contends that Judge Howatt erred by focusing on Robert's "conduct since the beginning of the case," including "how he responded to settlement offers," rather than focusing on discovery issues. This contention also fails for two reasons. First, Judge Howatt's comments regarding Robert's conduct are contained in the sanctions order, which was an immediately appealable order. (Code Civ. Proc., § 904.1, subd. (a)(12); *Rail-Transport Employees Assn. v. Union Pacific Motor Freight* (1996) 46 Cal.App.4th 469, 475 ["those cases involving misuse of the discovery process which result in sanctions exceeding $5,000 are reviewable by direct appeal"].) Robert forfeited his right to challenge this order by failing to timely do so. (*In re Baycol Cases I and II* (2011) 51 Cal.4th 751, 762, fn. 8 ["California follows a 'one shot' rule under which, if an order is appealable, appeal must be taken or the right to appellate review is forfeited"]; *People v. Ramirez* (2008) 159 Cal.App.4th 1412, 1421 ["In general, an appealable order that is not appealed becomes final and binding and may not subsequently be attacked on an appeal from a later appealable order or judgment"].)

Second, even if Robert had not forfeited this issue, he reads the order resulting from Judge Howatt's report too narrowly. Although Judge Howatt made reference to

25

Robert's conduct in settlement negotiations, he did so in the context of Robert's discovery conduct. As Judge Howatt explained,

> "The Court specifically finds that the Respondent Robert Pasulka has, without substantial (if any) justification, frustrated, delayed and purposefully refused and obstructed efforts at settlement of this dissolution action over the last four years *by* failing to respond rationally and constructively to multiple offers of settlement from the Petitioner Ms. Pasulka and *purposefully delaying and obstructing legitimate and reasonable discovery requests of the Petitioner.*"

> "The Court further finds that the Respondent Robert Pasulka has engaged in deliberate conduct that has been designed to frustrate the policy of the law that encourages settlement of litigation, reduce the costs of litigation and he *has demonstrated an unwavering uncooperative attitude regarding discovery* and settlement." (Italics added.)

Finally, Robert argues that because he ultimately produced all of the documents and discovery responses by the first day of trial—though, admittedly, beyond the court-imposed deadline—the court should have continued the trial rather than exclude Robert's documents. Robert cites no authority in support of this proposition and has thus forfeited it. (*Nelson*, *supra*, 172 Cal.App.4th at p. 862; *Falcone*, *supra*, 164 Cal.App.4th at p. 830.) In any event, whether viewed as a challenge to a discovery sanction or to the court's ruling on a request for a continuance, we review this issue for an abuse of discretion. (*Sauer v. Superior Court* (1987) 195 Cal.App.3d 213, 228 ["The court has broad discretion in imposing discovery sanctions, subject to reversal only for arbitrary, capricious or whimsical action"]; *Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984 ["The decision to grant or deny a continuance is committed to the sound discretion of the trial court. [Citation.] The trial court's exercise of that discretion will be upheld if it is

26

based on a reasoned judgment and complies with legal principles and policies appropriate to the case before the court"].) In light of the contentious and protracted nature of the case, which had been pending for over four years, and the court's finding that Robert had deliberately obstructed discovery, we cannot say that the trial court abused its discretion.

H.      *Borrowing from Kathleen's 401(k) Account*

Robert contends that the trial court erred in allowing Kathleen to borrow from her 401(k) to pay the arrearages on the mortgage and to pay a portion of her attorney fees. Specifically, he claims that this was error because Kathleen's income should have allowed her to pay the mortgage and her attorney fees without having to borrow from her 401(k), and, in any event, because she was an attorney she could have represented herself. We are not persuaded.

Regarding the mortgage, the judgment makes clear that the court was merely shifting equity from one community asset to another: "The court finds that the date of separation value in Petitioner's 401(k) was used to release Crownhill [the residence] from foreclosure, reinstate the Crownhill mortgage and bring the Crownhill mortgage current through May 2011." Robert fails to explain how this was erroneous or prejudicial. (*Nelson*, *supra*, 172 Cal.App.4th at p. 862; *Falcone* 164 Cal.App.4th 814 at p. 830.)

Regarding attorney fees, Kathleen was repaying the loan from her 401(k) with her postseparation earnings, which were her separate property. Further, we would not expect the trial court to require Kathleen, an intellectual property attorney, to represent herself in a family law matter.

27

*I.      Third-Party Debts to Mary Knapp and Tom Mullins*

Robert asserts that the trial court erred by failing to adjudicate the third-party debts that he alleged the community owed to Mary Knapp and Tom Mullins.  We disagree.

The judgment specifically addresses both debts and rejects Robert's claim for a lack of evidence, due to the court's exclusion of documents that Robert failed to provide during discovery.  As we concluded above, the court did not abuse its discretion in excluding those documents.

Robert argues that his own testimony should have been sufficient to establish the existence of the obligations.  However, the trial court's tentative ruling specifically rejected Robert's testimony, stating:

> "But, Mr. Pasulka, I have to say I didn't really find your testimony very credible.  You make assumptions and conclusions about loans and things like that without any backup.  [¶]  I've already sanctioned you once for your failure to comply with the discovery, and it just carried on in the case that you were not a credible witness.
>
> "[¶] . . . [¶]
>
> "As for the debts, the [$]45,000 Knapp debt, the Court is going to deny as insufficient.  There's no promissory note.  There was no evidence.  There was no evidence that came in regarding it.  Any evidence that could have come in was not produced and I did not allow it.  [¶]  There was the Mullins debt which was referred to. There was also insufficient evidence to support that debt."

The judge reiterated the court's finding "that [Robert] is not a credible witness."  We will not disturb the trial court's credibility determinations.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the

credibility of a witness and the truth or falsity of the facts on which that determination depends' "].)

*J.        Robert's Claims for Breach of Contract and Breach of Fiduciary Duty*

Robert asserts that the trial court erred by failing to rule on his claims against Kathleen for breach of contract and breach of fiduciary duty. It was Robert's obligation to obtain a ruling from the trial court. (*People v. Valdez* (2012) 55 Cal.4th 82, 122, ["Because defendant failed to pursue and obtain a ruling on these objections, he may not raise them on appeal"].) Robert had the opportunity to do so when he reviewed Kathleen's proposed judgment. Despite objecting on other grounds, Robert did not object on the ground that the judgment failed to address these claims. Consequently, Robert has forfeited this issue. (*People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 644-645 ["This specific argument was forfeited by appellant's failure to raise it in the trial court: Although appellants were given the opportunity to challenge and seek modification of the language of the notice, and did so in many particulars, they raised no issue with this aspect of the notice"]; *City of San Marcos v. Coast Waste Management, Inc.* (1996) 47 Cal.App.4th 320, 328 ["By repeatedly failing to object to the language of the proposed written order, Coast effectively waived any objection to it"].)

*K.        Robert's Motion for Attorney Fees, Interest, and Punitive Damages*

Robert contends that the trial court erred by failing to rule on his September 2012 motion for attorney fees, interest, and punitive damages because the court took the matter off calendar after Robert left the October 19, 2012 hearing to catch a flight. Kathleen argues that this issue is not properly before us because Robert's notice of appeal

29

addresses the March 2012 judgment that related to the October 2011 trial on property division, whereas the October 2012 hearing occurred seven months *after* the date of the appealed judgment. We agree with Kathleen. Although notices of appeal must be liberally construed (Rule 8.100(a)(2)), we cannot construe Robert's notice of appeal of the March 2012 judgment to include the court's action seven months later in taking a motion off calendar. (*Norman I. Krug Real Estate Investments*, *Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 47 (*Praszker*) ["The rule favoring appealability in cases of ambiguity cannot apply where there is a clear intention to appeal from only part of the judgment or one of two separate appealable judgments or orders. [Citation.] 'Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment being appealed.' [Citation.]."]; (*Truong v. Nguyen* (2007) 156 Cal.App.4th 865, 882 ["Generally, appellate courts disregard matters that occur after rendition of an appealed judgment"].)[13]

## L. *Judicial Notice of Ownership of the Residence*

The trial court found that the residence was presumptively community property. Robert contends that the trial court erred when it denied his request to take judicial notice of a deed and deed of trust that he contends would have established that he and Kathleen each owned one-half of the residence as their respective separate property, and not as community property. Robert's contention fails.

---

[13] It appears that even Robert did not construe his notice of appeal in this case as including the October 2012 hearing conduct, since he filed a separate notice of appeal regarding that issue on November 16, 2012. We denied his motion to consolidate that appeal with this one, and ultimately dismissed that appeal as arising from a nonappealable order.

30

*1.     Governing Legal Principles*

" 'Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is relevant to an issue in the action without requiring formal proof of the matter.  [Citation.]'  [Citation.]" (*Lockley v. Law Offices of Cantrell*, *Green*, *Pekich*, *Cruz & McCort* (2001) 91 Cal.App.4th 875, 882 (*Lockley*).)  "The underlying theory of judicial notice is that the matter being judicially noticed is a law or fact that is *not reasonably subject to dispute.*" (*Ibid.*)

"Judicial notice may not be taken of any matter unless authorized or required by law."  (Evid. Code, § 450.)  Evidence Code section 451 identifies matters which *must* be judicially noticed, while section 452 identifies matters which *may*.  Under Evidence Code section 453, the court nevertheless must take judicial notice of matters identified in section 452 if a party (1) requests it; (2) "[g]ives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request"; and (3) "[f]urnishes the court with sufficient information to enable it to take judicial notice of the matter."  (Evid. Code, § 453, subds. (a), (b).)  "In cases where the notice given does not satisfy this requirement, the court may decline to take judicial notice."  (Evid. Code, § 453, Law Revision Com. com.)  "Section 453 merely requires reasonable notice, and the reasonableness of the notice given will depend upon the circumstances of the particular case."  (*Ibid*.; Wegner et al., Cal. Practice Guide:  Civil Trials and Evidence (The Rutter Group 2013) ¶ 8:913, pp. 8C-118.4 ["What constitutes

31

'sufficient' notice depends, of course, on the facts of the case. This may be a hurdle for requests raised as tactical surprises during trial"].)

We review the trial court's ruling on the request for judicial notice for abuse of discretion. (*Fontenot v. Wells Fargo Bank*, *N.A.* (2011) 198 Cal.App.4th 256, 264 (*Fontenot*).)

### 2. *Analysis*

Robert's briefing does not address the trial court's ruling within the framework of judicial notice outlined above. Although Robert has forfeited this issue by failing to provide cogent argument and authority (*Nelson*, *supra*, 172 Cal.App.4th at p. 862; *Falcone*, *supra*, 164 Cal.App.4th 814 at p. 830), we nonetheless have considered the issue and conclude that the trial court did not abuse its discretion in denying Robert's request for judicial notice.

Judicial notice of recorded real property records is discretionary under Evidence Code section 452. (*Fontenot*, *supra*, 198 Cal.App.4th at pp. 264-265.) Thus, the trial court would have been *required* to grant Robert's request only if he (1) gave Kathleen "sufficient notice," and (2) furnished the court with sufficient information upon which to make its determination. (Evid. Code, § 453, subds. (a), (b).) The trial court found that Robert had not provided Kathleen with sufficient notice. We cannot say that the trial court abused its discretion in reaching that conclusion.

In his first responsive pleading in this case, Robert declared under penalty of perjury that the residence was community property. He repeated that assertion in several subsequent declarations that he filed during the litigation. In the parties' May 6, 2011

32

joint case management statement, Robert identified the characterization of Pacific RO as separate or community property as a "pivotal issue" but did not similarly list characterization of the residence. At a hearing before Judge Alksne three days later, Robert included the residence among the list of community assets to be divided at trial. Robert's final declaration of disclosures, which he belatedly served on Kathleen only four days before trial, listed the residence as community property. In light of this, Judge Alksne commented on Robert's request for judicial notice as follows:

> "So, Mr. Pasulka, in your schedule of assets and debts, you characterize the Crownhill residence as community property. This is a material change in your case that you've done on the day of trial.
>
> "[¶] . . . [¶]
>
> "Mr. Pasulka, the Court wants a fair trial . . . . okay? The case has been going on for four years. [¶] I'm looking at your schedule of assets and debts. You characterized this property as community property. They've relied on your characterizations of it. They characterize it as community property. And you come in on the day of trial with original certified copies of the title, where it's held in separate property. That is a last-minute change in the case, and it's unfair."

Kathleen's counsel responded, expressing a similar sentiment:

> "Your Honor, the reality is I haven't had a chance to look at those documents to review the significance, what they're used for, to do discovery, to depose Mr. Pasulka on these documents. Based on the fraud that has been done in this case, it is not untoward for me to need and require time instead of being surprised at the day of trial."

Under "the circumstances of th[is] particular case" (Evid Code, § 453, Law Revision Com. com.), the trial court did not err in denying Robert's request for judicial notice, on the basis of a lack of sufficient notice to Kathleen.

33

Wholly apart from the framework governing requests for judicial notice, Robert argues, without citation to authority, that the trial court erred because "title to the property is the way it is, and the court should have respected the title." The court properly found that the residence—which was undisputedly acquired during the marriage—was presumptively community property. (*In re Marriage of Weaver* (2005) 127 Cal.App.4th 858, 864 ["Generally, property acquired during marriage by either spouse, other than by gift or inheritance, is community property"], citing § 760.) This is a rebuttable presumption, which Robert bore the burden of rebutting. (*Ibid*.)

It is possible that Robert could have rebutted the general community property presumption by invoking the more specific "form of title" presumption. (Evid. Code, § 662.) "According to the 'form of title' presumption, the description in a deed as to how title is held is presumed to reflect the actual ownership interests in the property." (*In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 184-185.) In a conflict, the more specific form of title presumption would prevail over the general community property presumption. (*Id*. at p. 186 [" 'It is the affirmative act of specifying a form of ownership in the conveyance of title that removes such property from the more general presumption' "], quoting *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 814-815.) But a presumption "arises [only] when the foundational facts for the presumption are established." (*Coso Energy Developers v. County of Inyo* (2004) 122 Cal.App.4th 1512, 1536, citing Evid. Code, § 600.) And it is the proponent of the presumption who bears the burden of proving the foundational facts. (*Ibid*.) Because the court denied Robert's request for judicial notice—a determination that we have concluded was not error—

34

Robert failed to establish the foundational facts necessary to establish the form of title (or any other) presumption in rebuttal to the general community property presumption.[14]

Robert's other challenges to the court's ruling also fail. For example, Robert's claim in his brief that his attorney provided a copy of the deed to Kathleen's attorney in 2008 fails because he did not cite any evidence in the record that would support this claim. (*Denham*, *supra*, 2 Cal.3d at p. 564; *Ballard*, *supra*, 41 Cal.3d at p. 574; *Duarte*, *supra*, 72 Cal.App.4th at p. 856.) Robert's related claim that it was not his responsibility to provide another copy to Kathleen ignores that it was Robert's burden to rebut the presumption that the residence was community property. Similarly, Robert's assertion that Kathleen "could have and should have researched the title to the property on her own" again ignores Robert's burden and is undermined by the fact that Robert apparently did not research the state of title during the first four-plus years of litigation, either.[15]

---

[14]    We are not troubled by the prospect of disregarding what is *possibly* the true state of title for the residence as a consequence of Robert's failure of proof. The form of title presumption found in Evidence Code section 662 "is concerned primarily with the stability of titles, which obviously is an important legal concept that protects parties to a real property transaction, as well as creditors." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 294.) Our focus is on the characterization of marital property as between Kathleen and Robert. (*Id*. at p. 295 ["concerns of stability of title are lessened in characterization problems arising from transmutations that do not involve third parties or the rights of creditors"].)

[15]    When Robert made this same argument to the trial court, Judge Alksne interpreted it as an improper attempt to insult Kathleen's counsel. We will not second-guess that interpretation. (E.g., *Escobar v. Flores* (2010) 183 Cal.App.4th 737, 749 ["we have nothing but the cold, unadorned words on the pages of the reporter's transcript. The trial court, on the other hand, had the living, breathing [witness] before it"].)

On appeal, Robert requests that we take judicial notice of some of the same title documents that the trial court refused to judicially notice. These items are not matters of which we must take notice. (Evid. Code, §§ 451, 452, 459; *Fontenot*, *supra*, 198 Cal.App.4th at pp. 264-265.) Because Robert's request is nothing more than an attempted end-run around the trial court's denial of his request for judicial notice, we, too, deny his request.

## M. *Spousal Support*

Robert argues in passing that the trial court erred by awarding him insufficient spousal support. This issue is not properly before us. The trial court bifurcated spousal support from the first phase of trial. Consequently, the March 9, 2012 judgment that followed the October 2011 trial on property division did not address spousal support. The court's award of spousal support is contained in a separate order that is not mentioned in Robert's notice of appeal in this case. Accordingly, we will not review Robert's challenge to the spousal support order in this appeal. (*Praszker*, *supra*, 220 Cal.App.3d at p. 47.)

## N. *Robert's Breach of Fiduciary Duty*

Robert contends that the trial court erred in finding that his conduct in connection with *Pasulka I* constituted a breach of fiduciary duty. We disagree.

### 1. *Governing Legal Principles*

Section 1100 addresses the fiduciary obligations that spouses owe one another with regard to management of community assets during dissolution proceedings. Subdivision (e) provides, in pertinent part, as follows:

36

"Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721,[16] until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request."

Section 1100, subdivision (c), provides that "[a] spouse may not sell, convey, or encumber community personal property used as the family dwelling . . . without the written consent of the other spouse."

Section 1101, subdivision (a), provides that "[a] spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate . . . ." "Remedies for breach of the fiduciary duty by one spouse . . . shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs."  (§1101, subd. (g).)

---

16    Section 721 elaborates on the nature of the fiduciary duty that spouses owe to one another:  "[A] husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other.  This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.  This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners . . . ."

We review the trial court's finding of a breach of fiduciary duty for substantial evidence. (*In re Marriage of Duffy* (2001) 91 Cal.App.4th 923, 931.)

### 2. *Analysis*

Robert contends that the trial court erred in finding that he breached his fiduciary duty to Kathleen by stipulating to a judgment in *Pasulka I* because "he had the right to stipulate to a judgment" and was under no obligation to provide her notice before doing so. We disagree. Robert had a duty to disclose "material facts and information regarding . . . debts for which the community is or may be liable . . . ." (§ 1101, subd. (e).) Robert testified at trial that he understood that he owed Kathleen a fiduciary duty, which included the "duty to disclose material facts." As a lawyer, Robert had represented both plaintiffs and defendants with regard to fiduciary duties. With knowledge of this duty, Robert stipulated to entry of a $702,000 judgment approximately six months after he had repaid the underlying debt, and at a time when he knew that Kathleen was still unaware of the existence of the lawsuit. Robert admitted that it was probably he who suggested to William that Robert stipulate to entry of judgment. Additionally, after the resulting judgment lien was recorded, and while Kathleen was still unaware of it, Robert suggested to Kathleen that she stipulate to sell the residence and pay off "liens of record existing as of the date of th[e] Stipulation." Based on this conduct, it is clear that there is substantial evidence to support the trial court's finding that Robert breached his fiduciary duty to Kathleen by stipulating to entry of judgment in *Pasulka I*.

Even if Robert's stipulation to entry of judgment, standing alone, were insufficient to support the judgment, the judgment was based on additional findings that Robert has

38

not addressed on appeal and that are also supported by substantial evidence. For example, not only did Robert suggest the stipulated judgment to William, but Robert also assisted William's counsel in preparing the document. Further, during that process, Robert suggested to William's counsel that, even though Robert and William had agreed to five percent interest, they "change it to 10 percent to give Kathleen an incentive to sell . . . ." Also, by stipulating to judgment, Robert facilitated a judgment lien that encumbered the property, in violation of section 1100, subdivision (c). Additionally, William and Melanie never met with their accounting expert in *Pasulka I*; instead, it was Robert who "work[ed] closely" with him in preparing his report in preparation for the trial against Kathleen.[17] Finally, although it was not a basis specifically identified in the judgment, the record establishes that Robert attempted to persuade Kathleen to sell the residence and pay off all existing liens, knowing that she was unaware of the lien in favor of William and Melanie, and knowing that if Kathleen had agreed, the proceeds of the sale would have gone to William and Melanie and not Kathleen.

The facts here are similar to those in *In re Marriage of Murray* (2002) 101 Cal.App.4th 581. In that case, Bearl and Carole Murray stipulated to the sale of their residence during their dissolution proceeding, which netted proceeds of about $82,000. (*Id*. at p. 589.) About two months after the sale, one of Bearl's creditors sued him for $350,000 to recover money she had loaned him for business and personal use. (*Ibid*.)

---

[17]    Robert hired the same expert in this case. Judge Alksne commented on his testimony, "It was pretty shocking to the court to have the witness tell me he never met with your brother and sister, that you were the one who prepped him."

39

Bearl was served with the complaint, but did not contest the action, and the creditor obtained a default judgment against him. (*Ibid.*) Based on that judgment, the creditor immediately attached the proceeds of the sale of the residence. (*Ibid.*) In the dissolution proceeding, the trial court awarded all of the sale proceeds to Carole under sections 721 and 1101. The court found that Bearl's "creditor" was really a woman with whom he had been cohabiting for several years, that the promissory notes evidencing the "loans" were not substantiated by any backup, and that the creditor's use of the attached sale proceeds to pay Bearl's other true creditors was inconsistent with the position that Bearl's debt to this creditor was legitimate. (*Id*. at p. 592.) The court concluded that Bearl and the creditor "obviously committed a fraud upon [Carole] in the disposition of the assets from the [residence]" (*ibid.*), and awarded all of the sale proceeds to Carole under sections 721, 1100, and 1101. (*Id*. at pp. 592, 600.) Bearl appealed and the Court of Appeal affirmed. Although the court did not publish its discussion of the sufficiency of evidence, the published portion of the opinion states that "there is an abundance of evidence to support the court's finding of fraud." (*Id*. at p. 604.)

Like Bearl and his cohabiting creditor, Robert and his brother encumbered the marital residence based on an unsubstantiated (because it had already been repaid) debt. Similarly, as a remedy, Judge Alksne awarded Kathleen the entire residence under sections 721, 1100, and 1101. Judge Alksne's findings were supported by substantial evidence; there was no error.

IV.

DISPOSITION

The judgment is affirmed.  Kathleen is awarded her costs on appeal.


_____

AARON, J.

WE CONCUR:


_____

McDONALD, Acting P. J.


_____

IRION, J.

41