Filed 12/11/14  Cochran v. FremantleMedia North America CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| BRANDI COCHRAN, | B247541 |
| Plaintiff, Respondent and Cross-Appellant. | (Los Angeles County Super. Ct. No. BC432836) |
| v. | |
| FREMANTLEMEDIA NORTH AMERICA, INC., et al., | |
| Defendants, Appellants and Cross-Respondents, | |

APPEAL from orders of the Superior Court of Los Angeles County.  Kevin C. Brazile, Judge.  Affirmed.

Drinker Biddle & Reath, Sheldon Eisenberg, Kate S. Gold and Pamela K. Graham for Defendants, Appellants and Cross-Respondents.

Shegerian & Associates, Carney R. Shegerian and James Urbanic for Plaintiff, Respondent and Cross-Appellant.

_____

A jury awarded plaintiff Brandi Cochran almost $8 million in compensatory and punitive damages for pregnancy discrimination against her by defendants FremantleMedia North America, Inc. and The Price is Right Productions, Inc. The trial court granted defendants' motion for a new trial but denied their motion for judgment notwithstanding the verdict. Cochran does not challenge the order for new trial. Defendants do appeal, however, from the order denying their motion for JNOV, and Cochran cross-appeals from the trial court's failure to instruct the jury on "associational" disability. We affirm the trial court's orders granting a new trial and denying JNOV, and leave to the trial court's initial determination in the retrial whether an "associational" disability instruction is proper.

## FACTS AND PROCEEDINGS

The Price is Right is the nation's longest running television game-show. Appellant The Price is Right Productions, Inc. produces the show. Appellant FremantleMedia North America, Inc. owns appellant The Price is Right Productions, Inc. We refer to both companies collectively as "FremantleMedia."

For each episode of The Price is Right, FremantleMedia books three models to appear on-camera with the show's host. Historically, the show's producers chose the three models from a larger pool of about a dozen free-lance models. Cochran joined the show's pool of models in 2002.

Cochran's stage work was highly regarded, and she became part of the show's "A-Team" of models. The A-Team models were the five best models and appeared on the show more often than models who were not on the A-Team. No model was guaranteed work on the show, and although Cochran belonged to the A-Team, she was hired per episode like the other models. Some months, the show's producers booked Cochran for two or more weeks of shows, and other months they did not book her at all. Cochran never worked on the show for more than 600 hours a year, and during her last full year on the show in 2008, she worked about 570 hours.

2

Until he retired in 2007, Bob Barker was the show's host and executive producer. During the Barker era, the models had limited roles on stage and did not talk on camera. Barker's producer, Syd Vinnedge, believed that pregnant models should not wear bathing suits on the show, and Barker himself didn't even like models to perform while they were pregnant. Indeed, in 2007 at least one model was denied work because she was pregnant.

When Barker retired in 2007, comedian Drew Carey replaced him as the show's host and Barker's producer, Syd Vinnedge, became executive producer. In July 2008, Mike Richards joined Vinnedge as the show's co-executive producer. Richards and Vinnedge envisioned a different role for the models, which Richards and Vinnedge hoped would play to Carey's strengths as a performer. Under the new system, models would interact with Carey and the show's contestants more than models had during the Barker era. Richards and Vinnedge's ultimate goal was to eventually put microphones on the models and let them speak on-camera.[1]

In October 2008, Richards and Vinnedge reduced the pool of models from about one dozen to five. Richards kept those models who had the "best personality to interact on stage with Mr. Carey." Cochran was one of the five retained models. Cochran worked well with Carey. Her years of experience on the show helped Carey when he was still new to the production and not fully familiar with its games. Richards testified at trial: "Q. Mr. Carey never criticized Ms. Cochran's performance at any time before the decision was made to terminate her or take her out of her job; is that correct? [¶] A. That's correct. [¶] Q. He never said one word, October of 2008 through January of 2009 criticizing her, ever. [¶] A. That's correct."

On December 8, 2008, Cochran told then co-producer Kathy Greco that she was pregnant. Cochran also told Greco that her due date was June 2009 and she wanted to continue working as long as possible up to her due date. Accordingly, the show continued to book Cochran for upcoming episodes, scheduling her for two weeks of

---

[1]     In June 2010, the models received microphones and began talking on-camera.

taping in December 2008 and two weeks in January 2009. The show also scheduled her to appear on episodes to be taped in early March 2009.

During the January 2009 taping of the show's episode to be aired on Valentine's Day, Cochran announced on-camera to the show's staff and audience that she was pregnant with twins. About one month later in early February, Cochran learned that one of the twins she was carrying – a boy she and her husband had named Jack – had a fatal heart defect which was inoperable. Jack died in utero that month and on February 20, 2009, Cochran told Greco by email of Jack's death.

On March 2, 2009, Cochran went into premature labor and was hospitalized. Three days later, Cochran informed the show that she had been hospitalized and could not appear for the tapings scheduled in March. The following week, Cochran told Greco that she remained in the hospital and could not appear for an April 2009 taping, which had a Baby Shower theme.

On March 22, 2009, Cochran's surviving twin – a girl named Katie – was born about three months premature. Katie was placed in a neonatal intensive care unit (NICU) where she remained for several months. Based on her pregnancy and confinement to bed, Cochran applied for employment disability benefits in the spring of 2009. Following Katie's birth, Cochran also applied for disability benefits for her postpartum depression and other psychological symptoms related to Katie's precarious health.

In May 2009, while Katie was still in the hospital, a baby shower was held for Cochran which Greco attended. During the shower, Cochran told her guests about Katie's disability and placement on a ventilator. At the end of the shower, Greco told Cochran "Well, it's the most informative shower I've ever been to."

During the summer and fall of 2009, Katie gradually improved and gained strength. She was released from the hospital and sent home, where she remained on oxygen and a breathing monitor. In late 2009, Katie was healthy enough for her doctor to take her off oxygen and for Cochran and her husband to leave her with a babysitter, permitting Cochran to return to work.

In December 2009, Cochran sent two emails to Greco reporting she was available to return to work beginning January 10, 2010.  She asked that Greco schedule her for future shows.  Greco avoided committing to Cochran's return.  Greco told Cochran that the staff was on break for the holidays.  Greco explained that she needed to talk to Mike Richards, who had become the show's sole executive producer, about Cochran's possible return.  Greco said she would get back to Cochran after New Years.

Greco and Richards discussed Cochran's possible return.  Richards told Greco that the show was not going to rehire Cochran.  At trial, Richards testified that since Cochran's last appearance on the show in January 2009, the show had evolved into an ensemble format relying on fewer models.  Claiming that he was happy with the line-up of models then in place, Richards said Cochran was a "good model" but "would not take us to great."  Greco informed Cochran in February 2010 that the show would not rehire her because it no longer needed her services.

Less than one week later, Cochran filed her complaint against FremantleMedia.  The thrust of her complaint was that FremantleMedia had discriminated against her when she announced she was pregnant and after she gave birth.  She also alleged that FremantleMedia refused to let her return to the show because Katie's birth and early months had been difficult because of Katie's disabilities, and because Cochran had herself been mentally disabled with postpartum depression.  Cochran alleged multiple causes of action, including discrimination on the basis of pregnancy in violation of the Fair Employment and Housing Act (FEHA); discrimination on the basis of disability in violation of FEHA; and, wrongful termination of employment in violation of public policy.[2]  FremantleMedia's answer raised several dozen affirmative defenses, but did not assert a defense based on the First Amendment to the United States Constitution.

The case went to trial.  Jury selection began on October 18, 2012.  That day, FremantleMedia sought leave to amend its answer to add the First Amendment as an

---

[2]    Cochran alleged more than a dozen other causes of action which the trial court summarily adjudicated in appellants' favor.  Those causes of action are not before us.

5

affirmative defense. Its motion cited the six-day old memorandum decision of the United States district court in Tennessee in *Claybrooks v. American Broadcasting Co.* (case No. 3:12-cv-0038) (U.S.D.C. Tenn. Oct. 12, 2012), holding that the First Amendment protects casting decisions in television shows. We discuss *Claybrooks* and FremantleMedia's First Amendment affirmative defense in greater detail, *post*. The trial court denied FremantleMedia leave to amend. FremantleMedia does not meaningfully pursue on appeal the argument that the court erred by denying it leave to amend.[3] After hearing the evidence, the jury rendered a special verdict on Cochran's three causes of action. First, the jury found for Cochran on her claim of pregnancy discrimination. By special verdict, the jury found that FremantleMedia had failed to hire Cochran or had terminated her. The jury also found that Cochran's pregnancy was "a motivating reason for . . . [appellants'] failure to rehire or terminate her." Second, the jury found in favor of Cochran on her claim for wrongful termination of public policy. By special verdict, the jury found that Cochran's pregnancy was "a motivating reason" for FremantleMedia's terminating her or failing to rehire her. Third, and finally, the jury rejected Cochran's claim for disability discrimination. By special verdict, the jury found that appellant FremantleMedia had not known about Cochran's disability.

The jury awarded Cochran $776,994 in compensatory damages. Additionally, the jury found by "clear and convincing evidence" that FremantleMedia North America, Inc. and The Price is Right Productions, Inc. had acted with "malice, oppression, and/or fraud" against Cochran. The jury thus awarded Cochran $4,661,664 in punitive damages against FremantleMedia North America, Inc. and $3,107,776 in punitive damages against

---

[3] Although FremantleMedia's opening brief does not offer argument that the trial court abused its discretion in denying FremantleMedia leave to amend its answer, its reply brief does assert Cochran would not have been prejudiced if the court had granted leave. The trial court disagreed. Given that no date for retrial has been set in this case, the trial court might assess a renewed motion by FremantleMedia differently a second time around if, as in the first trial, that leave is not sought in the middle of jury selection. In any event in this appeal, we found no error.

6

The Price is Right Productions, Inc.  The court entered judgment for Cochran in the amounts awarded by the jury.

FremantleMedia moved for a new trial and judgment notwithstanding the verdict. The hearing on both motions was scheduled for March 2013.  While the motions were pending, our Supreme Court issued in February 2013 its decision in *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203.  After the Supreme Court issued *Harris*, FremantleMedia cited the decision to the trial court to support the proposition in their pending motions that FEHA, under which Cochran had sued FremantleMedia, required that discriminatory animus be a "*substantial* motivating factor," instead of merely "*a* motivating factor," for an adverse employment decision.  *Harris* stated:

> A plaintiff "must produce evidence sufficient to show that an illegitimate criterion was a *substantial factor* in the particular employment decision.  [Citation.] Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision.  At the same time . . . proof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the FEHA and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time."  (Italics in original.)  (*Harris* at p. 232.)

Pointing to *Harris*, FremantleMedia noted that the trial court had refused FremantleMedia's proposed jury instruction which had stated the legal standard that *Harris* established:  discriminatory animus must be a *substantial* motivating factor. Instead, the trial court had instructed the jury with the less demanding "*a* motivating factor" instruction rejected by *Harris*.  The trial court agreed, finding that it had erred in rejecting FremantleMedia's proposed "substantial motivating factor" jury instruction. Accordingly, the court granted FremantleMedia's motion for a new trial.  Cochran accepts on appeal that the trial court did not abuse its discretion in ordering a new trial based on *Harris*, and thus she does not challenge the new trial order.

The court denied, however, FremantleMedia's motion for JNOV. The court found that the evidence at trial was sufficient to permit the jury to find FremantleMedia had discriminated against Cochran because of her pregnancy. The court also found the evidence at trial was sufficient to permit the jury to find FremantleMedia had acted with malice or oppression against Cochran, warranting punitive damages. The court expressly rejected FremantleMedia's First Amendment defense – which had not been litigated at trial but was advanced in FremantleMedia's posttrial motions – as factually unsupported. The court noted:

"Defendants [FremantleMedia] did not establish what expressive content they were making in deciding to fire Plaintiff [Cochran]. Defendants argued at trial that they wanted to take the show 'from good to great;' however, the evidence was sufficient to permit a finding by the jury that such an answer was merely pretextual and not supported by the facts. Because the evidence supports finding that the reasons given were pretextual, the creative process cannot be sufficient to enter judgment notwithstanding the verdict because the conclusion is that the creative process was not the reason Plaintiff was terminated."

FremantleMedia filed a notice of appeal. Cochran filed a notice of cross-appeal.

### DISCUSSION
#### APPEAL BY FREMANTLE NORTH AMERICA, INC. AND THE PRICE IS RIGHT PRODUCTIONS, INC.

1.   *Sufficiency of Evidence of Pregnancy Discrimination*

FremantleMedia contends the evidence at trial was insufficient as a matter of law to support the jury's verdict that FremantleMedia had discriminated against Cochran because of her pregnancy. Thus, FremantleMedia argues, the trial court erred in denying FremantleMedia's motion for JNOV. To the extent FremantleMedia contends the judgment for Cochran was error because the evidence was insufficient to support the verdict, the contention is moot because the verdict is now a nullity following the court's order for new trial. But to the extent FremantleMedia contends that no reasonable trier of

8

fact – either in the original trial or in a future retrial – could possibly find that Cochran's pregnancy was a substantial motivating factor in her not being rehired, thus entitling FremantleMedia to judgment as a matter of law, we find its contention unpersuasive.

"A trial court is governed by well settled standards in determining whether to grant a motion for judgment notwithstanding the verdict (JNOV). The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict. The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict. [Citations.] On appeal from the denial of a motion for JNOV, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citation.]" (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1237; *Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596.)

FremantleMedia asserts it declined to rehire Cochran when she sought to return to the show in January 2010 because executive producer Richards envisioned a role for models different from their role when Cochran had last worked on the show in December 2008. The show's use of models after the Barker era had evolved under Drew Carey into an ensemble format relying on a small number of models. After Carey replaced Barker, the models began to interact with him and the show's contestants more than they had under Barker. When Cochran asked to return to the show, Richards was happy with the show's existing lineup of models for Carey. And although Richards thought Cochran was a "good model," she "would not take us to great." Richards testified that, regardless of Cochran's pregnancy, he eventually would have fired Cochran from the reduced pool of 5 models which he and then co-executive producer Syd Vinnedge had created when Carey became host. He testified:

> "Q. Mr. Richards, when would you have terminated Ms. Cochran in 2008 had she not become pregnant? When was that going to happen? [¶] A. . . . We made those kind of decisions more at the end of the season which is in June. June 2009. [¶] Q. So she wouldn't have been terminated ever in 2008; is that correct? [¶]

9

A. Yeah. I think that's correct. . . . [¶] Q. She wasn't terminated January, February, or March 2009; correct? [¶] A. Yeah, she was still in the model pool at that time, I believe. [¶] Q. And that last time you were here, you explained to us that decision to terminate her, you were 50/50 at the time; correct? [¶] A. Yes, sir. [¶] Q. And that you relied upon [former producer and current consultant] Syd Vinnedge and [producer] Adam Sandler; correct? [¶] A. That's correct. I think what the 50/50 was is important . . . I think it's 50 percent was do we bring her back to show off that she had her child and be a part of the ensemble, and then – but that would have been it at the end of that season, or do you just bring – not bring her back. [¶] . . . [¶] Q. You wanted to end her career regardless whether you did it in January when you brought her back, made a little show out of it, and then let her go? [¶] A. That was my thought, right."

Despite FremantleMedia's contention that its failure to rehire Cochran was a non-discriminatory casting choice aimed at making the show the best it could be and that rehiring Cochran would not have furthered that goal, there was sufficient evidence to prove pregnancy discrimination. Not every participant in an adverse employment decision against an employee needs to have discriminatory animus. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.) An "individual employment decision should not be treated as a . . . watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from . . . every other decision. [Citations.] Thus, showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*Id.* at p. 551.) The trier of fact may look to the constellation of facts and circumstances surrounding the employment decision, and need not parse each statement in isolation. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1055-1056; *DeJung*, at p. 551; CACI 2509.)

Producer Kathy Greco conceded under questioning by Cochran's trial attorney that if Cochran had not become pregnant in 2009, Cochran probably would not have lost her

job. Greco testified: "Q. If Ms. Cochran had never gone out in 2009, she never would have lost her job, correct? [¶] A. I can't say that. [¶] Q. Could you say with any certainty that if she had not gone out she would have lost her job? [¶] A. She probably would not have lost her job. [¶] Q. She still would be working there now, correct? [¶] A. Probably. [¶] Q. The reason she was out was because of her pregnancy and the complications? [¶] A. Yes. [¶] Q. As you know now, it was because of her disability regardless of whether it was mental or physical, correct? [¶] A. Yes."

FremantleMedia asserts that the meaning of Greco's testimony was not that FremantleMedia failed to rehire Cochran because she had been pregnant, but because she had been away from the show for more than a year. Moreover, according to FremantleMedia, because it had no legal obligation to keep a job open for her, no legal violation occurred when it did not rehire her.

FremantleMedia's interpretation of Greco's testimony is unavailing, however, because it is the prerogative of the trier of fact, not this court, to draw reasonable inferences from Greco's testimony. (*Taylor v. Nabors Drilling USA, LP, supra,* 222 Cal.App.4th at p. 1237 [court must accept as true the evidence supporting the jury's verdict and may grant JNOV only if there is no substantial evidence to support the verdict]; *Jones & Matson v. Hall, supra,* 155 Cal.App.4th 1596.) Cochran's absence from the show was inextricably tied to her pregnancy, permitting the jury to infer from Greco's testimony that Cochran's pregnancy played a role in FremantleMedia's decision not to rehire her.

In addition to Greco's belief about the connection between Cochran's pregnancy and FremantleMedia's refusal to rehire her, Greco herself made disparaging remarks about Cochran's pregnancy before Cochran gave birth to Katie.[4] For example, in late

---

**4**     Disparaging comments unconnected to an employment decision, and which amount to nothing more than stray remarks, do not by themselves support a cause of action for employment discrimination under FEHA, although non-stray remarks motivated by unlawful animus may support a harassment claim. (*Harris v. City of Santa Monica, supra,* 56 Cal.4th at pp. 225, 231.) But a trier of fact may view stray remarks as

11

January 2009 Greco commented about Cochran's pregnancy-related weight gain with what a trier of fact could infer was an unflattering remark. Cochran testified: "Q. Did [Kathy Greco] say anything else to you that made you feel un-welcomed? [¶] A. The last words Kathy said to me my last day were, I hate to see what you'll look like the next time we see you. You're really popping." That same month, Greco also described a miscarriage Cochran had suffered before her pregnancy with Katie and Jack as "nature's way of getting rid of a bad baby." Finally, Greco admitted that a model had been denied work on the show in 2007 during the Barker era because of her pregnancy. Greco testified: "Q. You knew a model [in] 2007 was being refused employment because she was pregnant. You knew that; right? [¶] A. Yes. [¶] Q. And you disagreed with it personally; correct? [¶] A. Yes. [¶] Q. You knew it was illegal based upon all your training; right? . . . [¶] A. I knew that she was not being allowed to work on the show. [¶] Q. You knew that it was illegal what they were doing; right? . . . No, I didn't think it was proper."

There was also evidence that executive producer Mike Richards harbored pregnancy-based animus. In December 2008 during the show's holiday party, he bemoaned the effect of Cochran's pregnancy on his staffing of the show. He said, "Go figure, I fire five models, what are the odds one of the ones that I keep gets pregnant." Moreover, Cochran perceived Richards as "cold," "rude," and "distant" toward her at the party. And when Cochran announced to the show's staff and audience in January 2009 that she was expecting twins, she saw Richards off-camera "put his head in his hands." Shortly thereafter he made his displeasure evident. Cochran testified: "Tell us about the conversation you had with [Mike Richards] either that day or the next day when you talked to him about your twins. A. . . . He stormed up to me and he said, "Twins? Are you kidding? . . . Are you serious?" [¶] Q. Do you have any reason to believe he was joking? [¶] A. No . . . . He was not happy. He was shocked. He was shocked and seemed mad."

circumstantial evidence of discrimination to be considered in light of other evidence of discrimination in the record. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 538.)

Finally, Cochran asserts that FremantleMedia's purported evidence that her pregnancy had nothing to do with her not being rehired, and was instead based on Drew Carey's success with the revamped line-up of models, was pretextual. Carey himself thought well of Cochran. He testified she never missed her on-camera cues and "was always professional." The show's director from 2002 when Cochran was first hired until 2007 testified: "Brandi was always a professional. She was always on time. I never had any problems with Brandi whatsoever. Camera loved her. What else can I say? . . . Brandi was a pageant person and Brandi has great stage presence; very comfortable in front of the camera; a quick – quick study. Pleasure to work with." And Syd Vinnedge, who had been Bob Barker's producer and then became co-executive producer with Mike Richards under Drew Carey before he became an independent consultant to the show, never received any complaints about her performance. He testified: "Q. Anyone from 2002, when she first came on the show . . . [to] April of 2009 . . . ever said, she's just not keeping up with how we're doing the show nowadays? [¶] A. No. [¶] Q. Did anyone say anything that remotely suggested that idea, Mr. Vinnedge. [¶] A. No."

Cochran argues the timing of FremantleMedia's refusal to rehire her suggests pretext. According to her, FremantleMedia willingly exploited her and her pregnancy when it suited its purpose of attaching an aura of happiness and good health to the show. For example, FremantleMedia had featured her on the show's website before she became pregnant. Additionally, her likeness was made into a character on the show's commercial video game. And she appeared on other television programs to publicize the show. But when she became pregnant, individual executives such as Richards shunned her. And after her pregnancy turned into a sad story of personal loss and hardship, FremantleMedia declined to rehire her. (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1110 [timing of termination may suggest pretext]; *California Fair Employment and Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1023; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479.) Former producer and co-executive producer and eventual consultant Syd Vinnedge testified that the show is not a "bad baby show." He explained that FremantleMedia used a variety of models to project

diversity in ethnicity, race, and hair color in order to appeal to as broad a television audience as possible.  But diversity stopped at problem pregnancies.  He testified:  "Q. And along that same vein [of diverse models], if there's a happy baby story about one your models, that could sell because you have some people in the audience who are pregnant?  [¶]  A.  Correct.  [¶]  Q.  But a bad baby story is hard to sell in your show, correct? . . .  [¶]  A. Yeah, I don't – I – first of all, we're not a 'bad baby story' show."

Finally, Cochran notes that FremantleMedia's witnesses contradicted each other about FremantleMedia's reasoning and procedures in deciding not to rehire her. Executive producer Richards testified that consultant Vinnedge told Greco that FremantleMedia should not rehire Cochran.  Greco confirmed that Vinnedge told her not to rehire Cochran.  Greco additionally testified that Vinnedge had not liked pregnant models when he had been an executive on the show.  She testified:  "Q.  What was your impression of his opinion on pregnant models on the show?  [¶]  A.  I think he also had an opinion that models should be model-like . . . [¶]  Q.  . . . By model-like you mean not pregnant?  [¶]  A.  Yes.  [¶]  Q.  So he didn't like the idea of a pregnant model on the show?  [¶]  A.  I think it was not his favorite. . . ."

Vinnedge, on the other hand, at first testified that he "wasn't involved in [the] decision" not to rehire Cochran.  But he later conceded under cross-examination that he told Greco not to rehire Cochran.  He testified:  "Q.  So your sum-and-substance input into this decision was to tell Kathy Greco, don't bring her back, right?  [¶]  A.  I – sum and substance, I wouldn't bring her back.  I wouldn't book her.  [¶]  Q.  No explanation, correct?  [¶]  A.  I don't think there was.  Not that I remember.  [¶]  Q.  In other words, you didn't give your explanation?  [¶]  A. That may be.  [¶]  Q.  Say that again, I'm sorry?  [¶]  A.  That maybe."

Producer Adam Sandler also participated in the meeting in January 2010 in which the show's senior executives discussed whether to rehire Cochran.  He testified at trial that during the meeting he quietly thought to himself that Cochran had become "unprofessional" in the two years before she became pregnant because she had begun to show up late for tapings and miss her cues.  He conceded under cross-examination,

however, that he did not at anytime share those thoughts with the show's director or other executives during the January meeting. He testified that he instead told the others during their meeting that he did not think her return would improve the show. But despite his silence about Cochran's purported unprofessionalism, he did manage, during a time when he did not know Cochran was pregnant, to criticize her appearance with a remark that could be construed as taking a dim view of pregnancy. He remarked to Greco that Cochran was not looking as good in her dresses as she usually did because the dresses were too tight, making him wonder if she was pregnant.

Only the retrial will establish whether Cochran's pregnancy was, as *Harris v. City of Santa Monica* requires, a substantial factor in her not being rehired. But the foregoing evidence from the first trial was sufficient for the trial court to deny FremantleMedia's motion for JNOV because a reasonable jury could find that Cochran's pregnancy was a substantial motivating factor in FremantleMedia's decision not to rehire her.

Finally, we note that we do not understand Cochran to assert that FremantleMedia was legally obligated to keep her position open for her during her absence from the show. A collection of at least three separate laws creates a range of job protections for a pregnant worker who goes on leave. But a quick survey of those laws shows why Cochran appears not to rely on them, and instead relies on evidence that FremantleMedia refused to hire her because of her pregnancy.

The Pregnancy Disability Leave Law (Gov. Code, § 12945), for example, entitles a pregnant worker to a reasonable amount of leave lasting no more than four months. Section 12945, subdivision (a)(1), of the law states that it is "an unlawful employment practice, unless based upon a bona fide occupational qualification: (1) For an employer to refuse to allow a female employee disabled by pregnancy, childbirth, or a related medical condition to take a leave for a reasonable period of time not to exceed four months . . . ." But because Cochran worked only part time for FremantleMedia, she was entitled to only a pro rata share of the maximum four months, which she would have exhausted sometime in the spring or early summer of 2009. (Cal. Code Regs., § 7291.9(a)(2).)

15

The California Family Rights Act also permits a pregnant employee to take up to 12 weeks a year in medical leave. To be eligible, however, the employee must have worked at least 1,250 hours during the year before going on leave. (§ 12945.1 et. seq. ["it shall be an unlawful employment practice . . . to refuse to grant a request by any employee . . . who has at least 1,250 hours of service with the employer during the previous 12-month period, to take up to a total of 12 workweeks in any 12-month period for family care and medical leave."].) The trial court summarily adjudicated that Cochran was not eligible for such leave, a ruling she has not challenged on appeal.

Finally, the Fair Employment and Housing Act permits an employee to request a "reasonable accommodation" for a pregnancy-related disability. Such an accommodation can be a temporary leave of absence. (*Sanchez v. Swissport, Inc.* (2013) 213 Cal.App.4th 1331, 1334, 1338-1339.) But Cochran does not appear to have requested a reasonable accommodation which would trigger FEHA. Moreover, the jury found by special verdict that FremantleMedia did not know about Cochran's disability.

The special verdict did not distinguish between Cochran's pregnancy disability or her disability based on depression and other psychological symptoms. The most sensible reading of the jury's verdict, however, based on the evidence at trial is that the jury concluded FremantleMedia did not know about Cochran's depression-related disability. Given that we agree with Cochran in her cross-appeal that a jury instruction on "associational" disability might be appropriate in the retrial if supported by substantial evidence, the trial court may wish to distinguish in its instruction at the retrial Cochran's disability from her pregnancy, her disability from her depression, and her associational disability arising from her relationship with her daughter.

2. *Sufficiency of Evidence to Support Punitive Damages*

A punitive damage award requires clear and convincing evidence of malice, oppression, or fraud. (Civ. Code, § 3294, subd. (a).) " 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff, or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety

16

of others." (§ 3294, subd. (c)(1).) " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (§ 3294, subd. (c)(2).) " 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (§ 3294, subd. (c)(3).)

The jury by special verdict found "clear and convincing evidence" that FremantleMedia acted with "malice, oppression, and/or fraud" in discriminating against Cochran because of her pregnancy. FremantleMedia contends that even if evidence of discrimination against Cochran existed, the evidence at trial was insufficient as a matter of law to support punitive damages. Thus, according to FremantleMedia, the court erred in denying its motion to enter judgment in its favor by JNOV on Cochran's claim for punitive damages. (*Amerigraphics, Inc. v. Mercury Cas. Co.* (2010) 182 Cal.App.4th 1538, 1550 [trial court used partial JNOV to strike punitive damages award]; *Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 446.)

We review the trial court's denial of JNOV to determine whether substantial evidence supported the jury's award of punitive damages. We uphold the award if substantial evidence exists. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 821 [ordinary principles of substantial evidence apply to appellate review of punitive damages award]; *Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1603 [appellate court applied substantial evidence standard of review to reverse trial court's JNOV that overturned jury's punitive damages award].)

"The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict. [Citations.] The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. . . . On appeal from the denial of a motion for JNOV, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citation.]" (*Taylor v. Nabors Drilling USA, LP, supra,* 222 Cal.App.4th at p. 1237 [court must accept as true

17

the evidence supporting the jury's verdict and may grant JNOV only if there is no substantial evidence to support the verdict]; *Jones & Matson v. Hall, supra,* 155 Cal.App.4th 1596.)

FremantleMedia contends that employment discrimination cannot, by itself, support punitive damages. (Cf. *Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, 716 ["wrongful termination in violation of public policy" without more is not "vile, base or contemptible" conduct needed to support punitive damages].) Otherwise, according to FremantleMedia, every act of employment discrimination would garner punitive damages. Furthermore, according to FremantleMedia, punitive damages were especially inappropriate here because FremantleMedia treated Cochran with sympathy and concern throughout her ordeal of losing her son and caring for Katie's special needs.

FremantleMedia's desire that we address punitive damages is premature because the trial court vacated the jury's verdict, including the punitive damages award. Thus, FremantleMedia currently has no obligation to pay punitive damages to Cochran. It bears noting, however, that although ordinary employment discrimination might not, without more, support punitive damages, discrimination accompanied by deceitfulness or other wrongdoing can support a punitive damages award. (*Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912 [employer's attempt to deceitfully hide intentional employment discrimination can be sufficiently "base, contemptible or vile" to justify punitive damages].) Here, whether it was by the "bad baby show" testimony or otherwise, Cochran persuaded the jury that FremantleMedia's response to her troubled pregnancy and her daughter's significant health problems involved "malice, oppression, and/or fraud." Upon retrial it will be for the trier of fact to determine, in the first instance, whether the evidence supports punitive damages. But we may not at this juncture remove from the trier of fact a decision it has not yet made. (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 59 ["Where reasonable minds could differ as to whether the evidence would support punitive damages, the resolution of the conflicting inferences and the weighing of opposing evidence is for the jury; for the court to grant a nonsuit in that

circumstance, or the appellate court to affirm a judgment of nonsuit, would be to usurp the jury's function."].)

3.     *Affirmative Defense of First Amendment*

FremantleMedia contends that even if it did not rehire Cochran because of her pregnancy, it is not liable for discrimination because its decision was a casting choice that the First Amendment protected.  The State of California has a compelling interest in preventing unlawful discrimination and sometimes may advance that interest by prohibiting certain types of speech.  (See *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134-136, 163 [First Amendment not violated by prohibition of racial epithets that create a "hostile workplace"].)  Under other circumstances, however, antidiscrimination statutes must yield to the First Amendment because the First Amendment permits a speaker to decide what, and just as importantly what not, to say. The "fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message."  (*Hurley v. Irish-American Gay, Lesbian and Bisexual Group* (1995) 515 U.S. 557, 573; *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 487-488 [freedom of speech protects what "speaker chooses to say and what he chooses not to say."].)

"The creation of a television show is an exercise of free speech."  (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143.)  Because a television show's casting decisions may convey a message, the First Amendment generally protects those decisions.  (*Id.* at p. 143 [First Amendment applies to "creation, casting, and broadcasting" of television program]; *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1521 [television station's selection of weather anchors is "essentially [a] casting decision" protected by the First Amendment].)  In *Claybrooks v. ABC, Inc.* (2013 M.D. Tenn. 2012) 898 F.Supp.2d 986, 997, 1000, for example, the court found that the producers of the television shows "The Bachelor" and "The Bachelorette" could racially discriminate in their casting decisions because the First Amendment protected the producer's decision to promote, or not promote, interracial romantic

19

relationships. (See also *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1055, 1070-1074 [suggesting First Amendment protected call-in radio program's age discrimination in selecting those callers whom the program put on the air].)

A principal theme of FremantleMedia's defense against Cochran's claims was that FremantleMedia wanted to take the show in a new direction when Drew Carey replaced Bob Barker and hoped to improve the show from "good to great." Keeping with that theme, FremantleMedia contends no evidence existed of its harboring discriminatory animus against pregnant models. FremantleMedia notes, for example, that models besides Cochran had worked on the show while they were pregnant. Indeed, Cochran herself worked when she was pregnant until complications with her pregnancy forced her hospitalization. Because, by FremantleMedia's estimation, Cochran tacitly recognized the weakness of her discrimination evidence given FremantleMedia's solicitude of pregnant models other than Cochran, FremantleMedia submits that Cochran cobbled together as an alternative theory to argue to the jury the notion that FremantleMedia treated her differently from other pregnant models because her pregnancy was a "sad story" or "bad baby story" that might push away the show's television audience. But, FremantleMedia observes, even if that notion were true – FremantleMedia failed to rehire her because her pregnancy might convey a sad message to the show's largely female audience – her alternative theory turns on the show's message and content; Cochran claimed discrimination, in other words, because FremantleMedia did not want to broadcast a show that conveyed sadness. But FremantleMedia's choices about the show's message, and the casting decisions conveying that message, are, according to FremantleMedia, protected by the First Amendment.[5]

---

[5] In a similar vein, FremantleMedia claims in passing that its casting decisions fell within the scope of the "business judgment rule," which permits FremantleMedia to run its business as it sees fit – provided, of course, that it does not discriminate unlawfully – and prohibits a jury from second-guessing FremantleMedia's business decisions. The trial court refused to instruct the jury on the business judgment rule. We need not address

20

FremantleMedia waited until jury selection during the third day of trial to raise the First Amendment as an affirmative defense to Cochran's claims. At that time, FremantleMedia sought to amend its answer to include the First Amendment. According to FremantleMedia, it discovered the availability of a First Amendment defense only after the federal district court in Tennessee issued its decision in *Claybrooks* mere days before trial started here. The trial court denied FremantleMedia leave to amend its answer, and appellants do not on appeal challenge that denial as an abuse of the court's discretion. Cochran thus asserts that the First Amendment was not raised or litigated in the trial court. Hence, according to Cochran, FremantleMedia cannot raise the defense for the first time on appeal. But FremantleMedia did raise the First Amendment in its motion for JNOV. And, more important, FremantleMedia contends the record on appeal contains all the facts we need to determine the First Amendment's applicability to Cochran's discrimination claims. FremantleMedia notes that when " 'a Federal right has been denied as the result of a [factual] finding . . . or where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts,' the reviewing court must independently review these findings. [Citation.] '[F]acts that are germane to' the First Amendment analysis must be sorted out and reviewed de novo, independently of any previous determinations by the trier of fact.' [Citation.] And the 'reviewing court must " 'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.' " ' [Citation.]" (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 889-890.)

The record before us does not entitle FremantleMedia to relief based on its First Amendment defense. FremantleMedia relies on the First Amendment as an affirmative defense. As an affirmative defense, FremantleMedia had the burden to prove it. (*Hinerfeld-Ward, Inc. v. Lipian* (2010) 188 Cal.App.4th 86, 93; *Seltzer v. Barnes* (2010)

whether that was error. Instead, we leave to the trial court in the first instance its determination whether the evidence at retrial will support such an instruction.

21

182 Cal.App.4th 953, 969.) Thus, it was FremantleMedia's burden at trial to establish that its right to free speech trumped Cochran's right to be free from discrimination. FremantleMedia asserts that Cochran's trial counsel wove the "sad baby" or "bad baby" theme into Cochran's entire trial presentation. But we note that the jury may, or may not, have embraced Cochran's sad or bad baby theme. We do not know because the jury did not make any findings about the show's message or content. We know only that the evidence convinced the jury that FremantleMedia discriminated against Cochran because of her pregnancy.[6] Moreover, although the trial court concluded in denying FremantleMedia's motion for JNOV that the First Amendment can protect a television program's casting decision even if the decision is discriminatory, the court noted that the First Amendment defense had not been litigated and thus FremantleMedia had failed to establish factual support for such a defense. The court stated: "Defendants failed to set forth and establish protected speech. Defendants did not establish what expressive content they were making in deciding to fire Plaintiff."

We agree. FremantleMedia cannot argue that its failure to rehire Cochran conveyed a protected First Amendment message unless it identifies what its message was. FremantleMedia dismisses out of hand a sad or bad baby message, but suggests no other message to take its place. Therefore even assuming FremantleMedia's First Amendment defense was not untimely, they failed to establish its application so far. On retrial, if FremantleMedia properly pleads such a defense, the parties will have an opportunity to fully litigate the issue.

---

[6]     Although FremantleMedia's argument rests on the jury having accepted the sad baby theme, FremantleMedia somewhat inconsistently rejects the theme as fatally flawed both factually and legally. Its reply brief states "There is no substantial evidence that this alleged 'sad baby story' played any role in the rehiring decision, and furthermore, the theory is not cognizable under FEHA."

Cochran requested that the trial court instruct the jury with modified form instruction BAJI 12.08, which defines disability discrimination as including discriminating against someone who *associates with* a person who has a disability.[7] Cochran's proposed instruction stated: "The terms 'physical disability' and 'mental disability' as used in these instructions include a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics." (See current Gov. Code, § 12926, subd. (m) renumbered to subd. (o) [mental and physical disability includes "a perception . . . that the person is associated with a person who has, or is perceived to have" a mental or physical disability].) Cochran contends that her association with her daughter supported the instruction. She argued to the trial court when discussing the instruction that "We're going to be asking for specific definitions to be given to the jury as to what a disability is under the law in California. . . . If [Cochran] associated with someone, and we've been arguing about this since day one . . . [if] she's associated with her daughter,

---

[7]     Cochran's opening brief in her cross-appeal only raises the trial court's purported error involving "associational" disability under BAJI 12.08. In their cross-respondents brief, defendants FremantleMedia and The Price is Right Productions confined their discussion to Cochran's claim of instructional error. Quite inappropriately, Cochran's reply brief in her cross-appeal covers much more than the single issue she raised in her opening brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 763-766 [ordinarily improper for appellant to raise new issues in reply brief unless they are rebuttal to issues raised by respondent]; 9 Witkin, Cal. Proc. 5th Chap. XIII, § 723 p. 790 ["Obvious considerations of fairness in argument demand that the appellant present all of his or her points in the opening brief."].) In particular, she improperly discusses issues and evidence pertinent to the appeal by FremantleMedia and The Price is Right Productions regarding pregnancy discrimination; as such Cochran tries to get another bite at the apple on issues from the appeal by FremantleMedia and The Price is Right; unfortunately, Cochran's tactic is not novel. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 267-268.) In response, appellants filed a motion to strike Cochran's reply brief. We deny the motion, but we have read Cochran's reply brief mindful that Cochran was limited to discussion of only the instructional error, and we disregard those parts of her reply brief that go beyond the scope of her cross-appeal. (*Id.* at p. 268.)

who has various physical problems in this key – [Court.] That's – that's – with all due respect, that's the daughter, not her. [Counsel.] No, but – [Court.] I'm not trying to be cruel or harsh, but the daughter has the breathing difficulties and is hooked up to all the machines, not Ms. Cochran. She was the caretaker. [Counsel.] Right. But by being associated with her daughter, that's what FEHA includes. It makes Ms. Cochran disabled by the association. This is by statute. . . . [Court.] Tell you what. The instruction is going to say mental disability." The trial court thus rejected Cochran's proposed instruction.

We view the evidence in the light most favorable to Cochran. We ask whether there was evidence that could have permitted the jury to find in her favor on a point covered by the omitted instruction, even if contrary evidence outweighed her favorable evidence. (*Alcala v. Vazmar Corp.* (2008) 167 Cal.App.4th 747, 754.)

Associational discrimination falls into one of three types. (*Rope v. Auto-Chlor System of Washington* (2013) 220 Cal.App.4th 635, 657.) One type arises when an employer fears an employee may be distracted at work because of another person's disability. It occurs when an "employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours." (See *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1101 [discriminatory animus underlay employer's statement that pregnant employee not suitable for promotion because she had "checked out" due to "temporary diversion of her attention" because of her pregnancy].)[8]

Cochran contends FremantleMedia unlawfully discriminated against her because it refused to rehire her based on its belief that caring for her daughter would distract her from work. She asserts the jury could have concluded that FremantleMedia did not want

---

[8]    Two other types of associational disability arise when an employer fears expenses the employer may incur because of the disability of the person with whom the employee associates, or the employer fears the employee might acquire or develop that other person's disability. (*Rope v. Auto-Chlor System of Washington, supra,* 220 Cal.App.4th at p. 657.)

the burden or inconvenience of one of the show's models needing to care for a disabled child. In support, she notes that during her leave she sent a number of emails telling FremantleMedia of her daughter Katie's medical problems. Those emails told FremantleMedia that Katie had "a lot of ups and downs" which Cochran had to deal with "day by day," and described Cochran's exhaustion from the demands created by Katie's special needs. In October 2009, Cochran sent an email to producer Kathy Greco confirming she had hoped to return to work that month, but Katie remained on oxygen and monitors and was receiving physical therapy which required Cochran to continue to take time off. And executive producer Mike Richards testified that he believed Cochran had extended her time off from the show in order to take care of Katie's medical needs. Richards testified: "Q. So as of January 2010 suffice it to say you knew exactly why Ms. Cochran had been out all that while? [¶] A. Yes. [¶] Q. And it was all pregnancy related, to your knowledge, right? [¶] A. No. Pregnancy, and then she had had the baby and that she was staying and helping with the baby. So it's not pregnancy, it's also – I think she was home with the baby. [¶] Q. The premature baby, right? [¶] A. Her baby, yes. Her premature baby, yes."

The foregoing evidence, if believed, is evidence that FremantleMedia may have been concerned about the effect of Katie's disability on Cochran. Whether that evidence was sufficient to support an associational disability instruction is academic, however, because of the court's order granting a new trial. We do not know what the evidence will show upon retrial about associational disability involving Cochran's relationship with her daughter. We leave to the trial court in the first instance the decision whether substantial evidence will support instructing the jury on associational-disability discrimination along the lines set out by Cochran's modified BAJI 12.08. But at this juncture, the trial court's error, if any, in rejecting Cochran's proposed instruction in the first trial is moot.

## DISPOSITION

The trial court's order granting a new trial and denying JNOV is affirmed. The case is remanded to the trial court for retrial. Respondent and Cross-Appellant to recover costs on appeal.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J.

GRIMES, J.